Lila E. BINNEY, Administratrix of the
Estate of John L. Binney, deceased,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Margaret J. LAVOY, Administratrix de
bonis non of the Estate of Kenneth
Gene Lavoy, deceased, et al., Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. Nos. 68–220, 68–229.

United States District Court,
D. Oregon.

June 15, 1971.

Harold D. Gillis, Butler, Husk & Gleaves, Eugene, Or., for plaintiff Lila E. Binney.

Robert H. Fraser, and Joe B. Richards, Luvaas, Cobb, Richards & Fraser, Eugene, Or., for plaintiff Margaret J. Lavoy.

Sidney I. Lezak, U. S. Atty., Michael L. Morehouse, Asst. U. S. Atty., Portland, Or., for defendant.

## OPINION

ALFRED T. GOODWIN, Judge:

Two federal-tort-claims actions are brought under 28 U.S.C. § 1346(b) by the widows of divers who drowned while working on a Corps of Engineers dam.

In April 1966, Hills Creek Dam, 44 miles southeast of Eugene, Oregon, was undergoing a biannual overhaul. The work required the sealing of the penstock, the intake pipe which carried water from the reservoir to the generators. A heavy bulkhead, which could be raised and lowered in a slot much as a sash slides up and down in a window frame, was designed to stop the flow of water, permitting gravity to empty the penstock.

Two days before the fatal accident, Corps of Engineers personnel discovered that they could not seal the penstock, even when the bulkhead was fully lowered into position. They suspected a malfunction in the hoisting mechanism where it was attached to the bulkhead. The project engineer and the powerhouse superintendent decided to call upon divers to make a physical inspection of the bulkhead mechanism.

The only possible access to the disabled mechanism was down the slot into which the bulkhead had been lowered. This slot was approximately two feet by 11 feet, and had a vertical depth of 150 feet. A gantry crane lifted and lowered the bulkhead by means of cables connected to a steel beam. Other cables were attached to a metal-framed cage, or "skip," which also was raised and lowered in the slot by the crane.

The project engineer asked Kenneth Lavoy to make the dive. Lavoy was an amateur diver who occasionally performed diving services for the Lane County Sheriff's department. He was employed by the Southern Pacific Railroad as a fireman. He also operated a scuba diving supply business. He had received diving instruction from a commercial diver. He was 23 years old at the time of his death.

The engineer and Lavoy tentatively agreed that Lavoy would inspect the bulkhead for $100.00. Lavoy agreed to provide his own equipment and to arrange for a second diver to assist him.

Lavoy employed as his assistant John L. Binney, a graduate student in physics at the University of Oregon. Binney had completed a training course in skin diving, including the use of scuba equipment. He was 29 years old.

The project engineer asked the chief of the purchasing section of the Corps of Engineers in Portland for authorization to employ local divers. No regula-

tions governing the hiring of divers were then in effect. The purchasing officer urged the project engineer to employ commercial divers, but finally consented to the employment of Lavoy upon assurances from the project engineer that Lavoy was qualified and that only an inspection dive was necessary. The project engineer then called Lavoy and confirmed the agreement.

Lavoy and Binney arrived the next morning, equipped for diving. The project engineer and Lavoy agreed upon detailed procedures for the dive. Lavoy was to make the deep dive to the disabled bulkhead at 130 feet, and Binney was to act as a safety man stationed with the skip at the 90-foot level.

The plan called for each diver to have a line to the surface tended by a Corps of Engineers employee. Another government employee was assigned the duty of keeping time. None of the Corps of Engineers workmen had ever before tended divers.

A diver-to-surface signal system was agreed upon. Signals on Lavoy's line would cause the crane operator to raise or lower the bulkhead; signals on Binney's line would cause the operator to raise or lower the skip.

Extra air tanks were attached to the skip to provide air for the anticipated 20-minute dive.

Shortly after noon, the actual dive began. The divers waited at the surface while the skip was lowered to the 90-foot level. When the skip was in place, the divers descended on opposite sides of the slot, Binney to 90 feet and Lavoy to 130 feet. While waiting with the skip, Binney was to use the reserve air tanks on the skip so that his back tank would be full for emergency use.

Lavoy took about ten minutes to complete his work on the lifting beam. He then ascended to the 90-foot level to join Binney and the skip. Binney gave the signal to raise the skip, and the divers ascended with it to the 10-foot level where they were to remain for a five-minute decompression stop. To this point, everything had proceeded according to plan.

After only about two minutes at the 10-foot level, Lavoy's line-tender felt something which he thought was a signal to bring the skip to the surface. Even though any such signal was to have come from Binney, the line-tender relayed the signal to the crane operator, who began raising the skip. Binney's line, which had been taut, suddenly went slack and floated to the surface. Corps of Engineers' employees observed a diminishing number of bubbles coming from Binney's side of the slot. No one raised any question, however, concerning Binney's whereabouts.

Lavoy surfaced with the skip. The project engineer, who had been tending Binney's line, went over to Lavoy's side of the slot to receive Lavoy's report on the condition of the bulkhead. During the ensuing discussion, no one told Lavoy that Binney's line was slack, or that his bubbles were no longer visible.

Finally, Lavoy's line-tender asked where Binney was. When Lavoy's attention was drawn to the fact that Binney had not surfaced, Lavoy instructed the crew to get some fresh air tanks from the trunk of his car so that he could make a second dive, and to lower the skip again to 90 feet.

Lavoy was treading water in the slot some 17 feet below the deck surface. About 15 minutes elapsed from the time Lavoy surfaced to the time he dived again for Binney. Lavoy descended rapidly to the bottom of the bulkhead slot, some 150 feet. He then began ascending. At a point one third to one half of the way back up, his line began moving laterally toward the opposite side of the slot, and his ascent stopped. Heavy turbulence of air bubbles appeared in the water, and then all bubbles stopped. After about a minute, someone decided to raise the skip to the surface.

As the skip cleared the water, it brought up Lavoy's body, lying chest-down over the hoisting block between the cables. Lavoy's tending line was

fouled in the crane cable, and his back pack and tank were badly mangled. Engineer employees brought a rope ladder from the adjoining building and descended to the water surface. They tried to revive Lavoy by mouth-to-mouth resuscitation. Lavoy could not be revived.

Four commercial divers arrived later in the afternoon, and recovered Binney's body from the bottom of the slot. His diving gear was intact, and an unused supply of reserve air remained in his tank. The air hose from his "demand"-type regulator was found tucked under Binney's arm. There was an abrasion on Binney's left forehead.

After an autopsy, the pathologist stated that the abrasion could have been caused by a blow sufficient to render Binney unconscious. Such a blow might have resulted from the unexpected pulling upward of the skip while Binney was alongside using its air tanks.

One year after the accident, Margaret Lavoy filed a claim for compensation for her husband's death. The Bureau of Employees' Compensation of the United States Department of Labor rejected this claim on the ground that Lavoy was not a civilian employee of the United States within the meaning of the Federal Employees' Compensation Act, 5 U.S.C. §§ 8101 et seq. Mrs. Lavoy did not appeal this administrative decision. Binney's widow also filed a claim, which was rejected.

These tort-claim actions were commenced while the compensation claims were pending, in order to avoid the possibility of a time bar.

If Lavoy and Binney were not entitled to compensation, as the government successfully contended in the compensation hearing, these actions are not barred by the exclusive-remedy provision of the Compensation Act.

There is a question whether the tort claims are controlled by local negligence law or by the more-favorable-to-plaintiffs provisions of the local Employers' Liability Act.

■ The United States, through its Corps of Engineers, participated in the diving enterprise and had primary control over the instrumentalities used in the dive. Therefore, the government is liable for the results of negligence of its employees even though the decedents may have been independent contractors rather than government employees. United States v. Cline, 410 F.2d 1337 (9th Cir. 1969); Tallmon v. Toko Kaium K.K. Kobe, 278 F.Supp. 452 (D. Or.1967); Myers v. Staub, 201 Or. 663, 668, 272 P.2d 203 (1954).

■ The widows also have a valid claim under the Oregon Employers' Liability Act. An independent contractor is not necessarily barred by reason of his independence from recovering against his employer under the Oregon Employers' Liability Act. ORS 654.305. See *Tallmon* and *Myers, supra.*

■ The government argues against application of the Oregon Employers' Liability Act in this case by pointing to the language of the Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674. That Act subjects the United States to liability for the torts of its employees in the same manner and to the same extent as a private individual would be liable under similar circumstances.

The government argues that because a private-individual employer who complies with the state Workmen's Compensation Law is not liable to his employees under the Oregon Employers' Liability Act, the government should not be liable. The government administers its own workmen's compensation scheme under 5 U.S.C. § 8101 et seq., and therefore cannot comply with the state scheme. It does, however, provide nonfault workmen's compensation recovery, and thus does comply with the spirit of the state laws. The government says that it has done all it can do as an employer to fit within the category of employers who are not subject in Oregon to damage actions by or on behalf of their employees.

Thus, the United States argues that it should not be subject to the strict rules

of unlimited liability imposed by the Oregon Employers' Liability Act, because such a result would place the government in a worse position than is occupied by any Oregon employer.

■ The government's argument is foreclosed by Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960). The liability of the United States under the Oregon Employers' Liability Act is no broader than that of a private employer which, like the government in this case, does not provide workmen's compensation coverage for independent contractors injured under liability-producing circumstances.

I need not decide whether these actions would lie if the government had compensated these plaintiffs under the Federal Employees' Compensation Act. The government denied compensation. The government, if negligent, is therefore liable for losses proximately caused by its negligence.

■ The government argues that if plaintiffs are entitled to recovery it must be limited in each case to $25,000, which was the maximum amount allowable under Oregon's wrongful-death statute (ORS 30.020) at the time of the accident. This argument, however, is foreclosed by the conclusion that the Oregon Employers' Liability Act applies. The Employers' Liability Act has no limit upon recovery.

■ The standard of care the Oregon Employers' Liability Act imposes upon the employer has been violated in this case. ORS 654.305 provides:

> "Generally, all owners * * * and other persons having charge of, or responsible for, any work involving a risk or danger to the employes * * * shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the * * * device, and without regard to the additional cost * * *."

The government failed to use every device and precaution to protect Binney and Lavoy. The Corps of Engineers employees tending lines were inexperienced. No emergency equipment was brought to the diving site in time to do any good, and no emergency plan was established. There was no standby diver topside, nor even an experienced line-tender. The prearranged signal system was violated by the Corps personnel. A government workman raised the skip from the 10-foot level after only two minutes of the planned five-minute decompression stop, and did so on the wrong signal. Binney's slack line and the cessation of his bubbles went unnoticed for several minutes. And, finally, Corps personnel permitted Lavoy to dive again in his exhausted state after he had spent 15 minutes treading water in the bulkhead slot. These and other failures to use every care and precaution in arranging for and carrying out the dive were the proximate cause of the deaths of the two decedents. I need not speculate on which of the many acts of negligence was the precise cause of the death of each diver. The liability of the United States for the losses sustained is amply established. United States v. Cline, 410 F.2d 1337 (9th Cir. 1969).

■ I find that neither of the decedents was guilty of negligence in any particular which was shown to be a contributing proximate cause of his death. I believe that each acted, so far as the evidence shows, reasonably under the circumstances.

■ The final question is that of damages. After taking into account expert evidence of the projected earnings of the two decedents, and the cash value of the other compensable losses to the plaintiffs, and after deducting the estimated amounts that would have been consumed by the decedents, I have concluded that plaintiff Lavoy is entitled to $400,000.

■ Because of differences in training and academic degrees. Binney's earnings during his professional life probably

would have exceeded those of Lavoy by a substantial amount. Plaintiff Binney is entitled to $450,000.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). The Clerk will enter judgment in the amounts set forth above.