Harriet McGARRY, Individually, and as guardian ad litem of Dennis McGarry, a minor, Plaintiff,

v.

UNITED STATES of America, Defendant.

Patricia McGarry SCHELL, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. Nos. LV–1504, LV–1628.

United States District Court, D. Nevada.

Oct. 30, 1973.

Bradley & Drendel, Ltd., Reno, Nev., for plaintiffs.

V. DeVoe Heaton, U. S. Atty., Las Vegas, Nev., James P. Klapps, J. Chas. Kruse, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

ROGER D. FOLEY, Chief Judge.

### Facts

The plaintiffs have filed this wrongful death action under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), to recover damages resulting from the death of Thomas McGarry, who died as the result of an accidental electrocution on the Nevada Test Site of the United States Atomic Energy Commission. The Nevada Test Site is a Government-owned nuclear testing facility managed, operated and maintained by Reynolds Electrical and Engineering Co., Inc. (REECo), an independent contractor. In addition to performing direct services and activities incident to the AEC testing program, the contract provided that REECo would provide, maintain, operate and distribute electrical power on the test site. The power lines,

circuit breakers, transformers, substations and other electrical facilities on the Nevada Test Site and the electricity supplied through such facilities are owned by the defendant United States of America.

The decedent Thomas McGarry was an employee of REECo who, on the day of the accident, December 10, 1969, had been assigned by a REECo drilling supervisor to certain duties involving the use of a portable drilling rig. The accident occurred when the mast of the rig Mr. McGarry was driving came into contact with an overhead high voltage power line.

The accident occurred at a location designated as Ue10–ITS#2 located in Area 8 of the Nevada Test Site. Within Area 8 the Lawrence Radiation Laboratory, another independent contractor, had previously determined that six exploration holes would be drilled. Prior to December 10, 1969, a third independent contractor, Holmes and Narver, Inc., had surveyed the exploration site and had physically located exploratory hole Ue10–ITS#2 with a stake and marker. Mr. McGarry and his assistant, Mr. Dasher, had driven their portadrill rig to the exploration hole to map out and drill anchor holes which were to be used to run steel cables to hold and stabilize the stationary drilling equipment which was used to drill the actual exploration hole.

Mr. McGarry and Mr. Dasher had mapped out the anchor holes and raised the mast on the portadrill rig and were proceeding to the location of the first anchor hole when the mast came into contact with an overhead power line which had not been observed by either worker. When the portadrill rig mast came into contact with the power line, Mr. McGarry stopped the truck and alighted. Mr. McGarry then came in contact with the rig and was electrocuted.

*Federal Tort Claims Act Liability*

■■ The Federal Tort Claims Act, 28 U.S.C. § 1346(b), provides:

" . . . the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

This act waives the sovereign immunity of the United States for the negligent acts or omissions of its employees, and subjects it to the same liability for such negligent acts or omissions that a private person would be subjected to under the law of the state in which the occurrence giving rise to the liability happened. The purpose of the waiver of sovereign immunity was defined by the United States Supreme Court in *Rayonier v. United States*, 352 U.S. 315, 77 S. Ct. 374, 1 L.Ed.2d 354 (1957), and the act is to be construed to effectuate such purpose. In the *Rayonier* case, the Supreme Court, holding that the "governmental activity" immunity of municipal corporations was not available to the United States in an action brought under the FTCA, stated:

"It may be that it is 'novel and unprecedented' to hold the United States accountable for the negligence of its firefighters, but the very purpose of the Tort Claims Act was to waive the Government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability. The Government warns that if it is held responsible for the negligence of Forest Service firemen a heavy burden

may be imposed on the public treasury. It points out the possibility that a fire may destroy hundreds of square miles of forests and even burn entire communities. But after long consideration, Congress, believing it to be in the best interest of the nation, saw fit to impose such liability on the United States in the Tort Claims Act. Congress was aware that when losses caused by such negligence are charged against the public treasury they are in effect spread among all those who contribute financially to the support of the Government and the resulting burden on each taxpayer is relatively slight. But when the entire burden falls on the injured party it may leave him destitute or grievously harmed. Congress could, and apparently did, decide that this would be unfair when the public as a whole benefits from the services performed by Government employees. And for obvious reasons the United States cannot be equated with a municipality, which conceivably might be rendered bankrupt if it were subject to liability for the negligence of its firemen. There is no justification for this Court to read exemptions into the Act beyond those provided by Congress. If the Act is to be altered that is a function for the same body that adopted it."

However, the United States still remains immune from certain types of liability which may be imposed upon private persons by reason of the limitation of the waiver of sovereign immunity only to liability for negligent acts or omissions of its employees. By reason of this limitation on the waiver of immunity, the United States cannot be held liable for a claim arising under the doctrine of strict liability or absolute liability without a showing of fault on the part of an employee of the United States. This rule was first enunciated in Dalehite v. United States, 346 U.S. 15, 44–45, 73 S. Ct. 956, 972, 97 L.Ed. 1427 (1953):

"It (FTCA) is to be invoked only on a 'negligent or wrongful act or omission' of an employee. Absolute liability, of course, arises irrespective of how the tortfeasor conducts himself; it is imposed automatically when any damages are sustained as a result of the decision to engage in the dangerous activity. The degree of care used in performing the activity is irrelevant to the application of that doctrine. But the statute requires a negligent act. So it is our judgment that liability does not arise by virtue either of United States ownership of an 'inherently dangerous commodity' or property, or of engaging in an 'extrahazardous activity' ".

*Dalehite* was recently reaffirmed by the Supreme Court in Laird v. Nelms, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972), where the Court held that the United States was not liable under the doctrine of absolute liability for sonic booms, but observed that liability could have been imposed if there had been a showing of negligence on the part of Government employees in planning or conducting the flight.

Similarly, by reason of the limitation of the waiver of immunity to the negligent acts or omissions of its own employees, the United States cannot be charged with liability based on the imputation of negligence of an independent contractor. The United States cannot be held vicariously liable for the negligence of an independent contractor because one of its own employees has not committed a negligent act or omission. Gowdy v. United States, 412 F.2d 525 (6th Cir. 1959); Strangi v. United States, 211 F.2d 305 (5th Cir. 1954); Dushon v. United States, 243 F.2d 451, 17 Alaska 245 (9th Cir. 1957); United States v. Dooley, 231 F.2d 423 (9th Cir. 1955); United States v. Page, 350 F.2d 28 (10th Cir. 1965); Roberson v. United States, 382 F.2d 714 (9th Cir. 1967); and Grogan v. United States, 341 F.2d 39 (6th Cir. 1965). Further, the United States will not be held liable for the negligence of an independent contractor, even when that contractor is performing a nondelegable duty owed by the United States. Even though the duty is nondel-

egable, if the negligence is by the independent contractor, it is not a negligent act or omission by a United States employee, so there is no government liability. United States v. Page, 350 F.2d 28 (10th Cir. 1965).

■ It is clear that the Government will not be held liable for the exercise of a discretionary function. The statutory exception, 28 U.S.C. § 2680(a), states:

"The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance of the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

As stated in Blaber v. United States, 332 F.2d 629 (2nd Cir. 1964), with respect to the discretionary function exception and the AEC:

"The AEC may have considerable power to control the activities of private companies through contracts, but when the Commission decides the extent to which it will undertake to supervise the safety procedures of private contractors, it is exercising discretion at one of the highest planning levels. Decisions of this kind are therefore within the 'discretionary function' exception of 28 U.S.C. § 2680(a)."

■ The above principles which immunize the United States from certain types of tort liability under the FTCA are much too firmly entrenched and established in the law to be seriously challenged by the plaintiffs in the instant case. Although the present case presents an obvious basis for the imposition of absolute liability or the imputation of the negligence of an independent contractor if the defendant were a private person, the plaintiffs are not asserting that type of liability against the United States. The plaintiffs' claims against the United States are predicated solely upon the negligence of employees of the United States. The fact that someone else might be charged with absolute liability, or the fact that an independent contractor might have been negligent, does not absolve the United States from liability under the FTCA if its employees were also negligent. The plaintiffs have succinctly stated their theory of recovery in their post-trial brief, page 8, 11.10–17:

". . . the fact that the liability of the Government may not be as broad as the liability of a private citizen does not absolve the Government from liability where the claim falls within the sphere of the liability imposed by the Act. Stated a different way, the fact that the Government may be absolved from liability predicated upon strict liability, absolute liability of the breach of a non-delegable duty in a situation where a private person would be held liable does not absolve the Government from liability predicated upon the negligence of its own employees."

■■ The plaintiffs must rely upon the negligence of a Government employee. In order to find a party liable for negligence, it is necessary to show a duty to the person injured, a breach of such duty by failure to act in accordance with that degree of care required by law, and an injury that proximately results from such breach of duty. The duty breached may be either by act or omission. In a FTCA suit it is not necessary to show specifically which Government employee breached the duty owed by the United States. Once there is a duty established, the liability does not depend solely upon the misfeasance of some Government employee; the omission or failure to act is sufficient for liability. United States v. Hull, 195 F.2d 64 (5th Cir. 1952). The primary question then is whether the defendant had a duty to act, for in the absence of

a duty a failure to act does not constitute negligence. Was the United States charged with a duty to act with regard to the safety of the employee of an independent contractor?

### Duties owed by the AEC

The plaintiffs contend that affirmative duties were imposed upon the United States, through its agency, the AEC, by (1) Federal statute, (2) Nevada statute, (3) reason of its ownership, possession and control of the Nevada Test Site, and (4) by reason of it being the owner, supplier and distributor of electricity throughout the Nevada Test Site. These four duties which the plaintiffs contend were imposed upon the AEC, regardless of whether they were also imposed upon various independent contractors, will be discussed individually within.

Before discussing the various duties, the theory of negligent contractor selection will be disposed of. The plaintiffs do not rely on this theory. At page 11, line 30, plaintiffs post-trial brief, it is stated:

> "There is no question but that the Government is not liable for the discretionary decision of choosing to proceed by using independent contractors. The Plaintiffs herein do not contend that the Government was negligent in using independent contractors, nor do they predicate their claim upon a contention that the Government negligently selected an incompetent independent contractor."

### A.

### Duties Imposed upon the AEC by Federal Statute

The plaintiffs argue that certain federal regulations which were incorporated into the contract create a duty owed by the AEC to the deceased. The contract between REECo and AEC, page 12, paragraph 7, and page A–17, paragraph A–27 (Plaintiffs' Pre-trial Conference Memorandum, page 11), incorporates numerous federal regulations, compliance with which is subject to the supervision and inspection of the AEC. The contract, in effect, requires the contractor, REECo, to comply with certain federal Corps of Engineers regulations and gives the AEC the power to stop all work in the event that the contractor fails to comply with the requirements. The plaintiffs argue that the AEC had the duty to require the compliance with all of the regulations incorporated into the contract. The duty was imposed by the federal regulations as incorporated into the contract.

The law is well settled that the reservation of the right to inspect and the right to stop the work does not in itself create a duty in the Government. As stated in Kirk v. United States, 270 F.2d 110 (9th Cir. 1959):

> "The fact that the United States retained the right to inspect the work under construction to see that the provisions of the contract were carried out and also retained the right to stop work if they were not is not sufficient in itself to make the United States liable for damages resulting from negligence of the contractors in their performance of the contract."

Numerous other cases hold that retaining the right to inspect and stop work creates no duty in the Government. Market Insurance Co. v. United States, 415 F.2d 459 (5th Cir. 1969); Gowdy v. United States, 412 F.2d 525 (6th Cir. 1969); Baum v. United States, 427 F.2d 215 (5th Cir. 1970); Fisher v. United States, 441 F.2d 1288 (3rd Cir. 1971).

The right of inspection and the right to stop work created no duty in the Government, but do the federal regulations themselves create a duty to plaintiffs' decedent which should have been carried out? The fact that the federal regulations incorporated into the contract create no such duty on the Government is well explained in Kirk v. United States, 161 F.Supp. 722 (S.D.Idaho 1958), affirmed 270 F.2d 110 (9th Cir. 1959):

> "It is the contention of the plaintiffs, inter alia, that the defendant was charged by law with the positive

duty of accident prevention at the Lucky Peak Project; that the minimum requirements of this duty are set forth in the Manual, 'Safety Regulations', Exhibit No. 16; and that the failure of the Government employees to effectuate such a program of accident prevention and more particularly to effectuate the provisions of the said Manual was negligence for which the defendant is liable, regardless of any possible contributory negligence on the part of the deceased. This Court is of the opinion that the duty on the part of the Corps of Army Engineers to initiate and carry out a safety program did not create a duty or an obligation of care to the deceased. It is not sufficient that some duty or obligation may have been neglected by the defendant or its servants, but it must have been some duty or obligation owed the deceased. The United States v. Marshall, 9 Cir., 230 F. 2d 183. In Goodwill Industries of El Paso v. United States, 5 Cir., 218 F.2d 270, at page 272, it is stated:

'In summation, it follows that the appellant cannot recover against the United States: * * * (c) for breaches of duty which are not held actionable under the law of the state where the injury occurred.'

"The rules and regulations relied upon to establish a statutory duty to plaintiffs' decedent, were not passed or promulgated for the purpose of establishing a duty of care and concomitant liability on the part of the Government and its employees toward one standing in the position of the deceased. It should be noted that the 'Safety Regulations' were made applicable to the contractor at the Lucky Peak Project only through the contract provisions and not by force of law. These rules, if applicable at all, were at most evidence of what was a reasonable standard of care."

The above rule was followed in United States v. Page, 350 F.2d 28 (10th Cir. 1965) and in Market Insurance Co. v. United States, 415 F.2d 459 (5th Cir. 1969), where the Court said:

"Under the general provisions of the contract (paragraph GC–16), the contractor had a duty to comply with the Corps of Engineers safety manual. The safety manual required the contractor to place warning signs where necessary to provide proper and adequate warnings of hazards to workmen and to the public. The contractor was also obligated to take such additional measures as the contracting officer of the Corps might determine to be reasonably necessary for the purpose of providing safety controls for the protection of the life and health of the employees and other persons.

"In cases where employees of independent contractors such as Loftin have sustained injuries while performing work for the United States, plaintiffs-employees have unsuccessfully argued that the United States, by the safety provisions of a government contract, has assumed a contractual obligation to the injured employee. See Beason v. United States, 396 F.2d 2 (5th Cir. 1968) (per curiam); Kirk v. United States, 161 F.Supp. 722 (S.D.Idaho 1958), aff'd 270 F.2d 110 (9th Cir. 1959).

"Issuance of regulations and a manual relating to a safety program does not render the government liable for the death of an employee of an independent contractor under the Federal Tort Claims Act. Cf. Kirk, supra."

A very recent Ninth Circuit case rejects the idea that federal regulations create a governmental duty to the employee of a contractor. In United States v. DeCamp, 478 F.2d 1188 (9th Cir. 1973), an employee of an independent contractor of the Army Corps of Engineers was killed when his bulldozer made contact with a live willow tree. The district court found that the accident would not have occurred had the bulldozer been equipped with a canopy guard or roll bar. A provision of the

Corps of Engineers' safety manual required canopy guards, but the Corps' resident engineer determined that the guards were not necessary for the particular project. The district court held that the decedent's employer, the independent contractor, was not negligent in failing to provide canopy guards because the custom and usage in the area was for contractors not to use canopies or roll bars for clearance projects. The district court held the Government negligent because the statement of the resident engineer served to waive the application of a regulation that would have required canopies and this waiver breached the Government's duty of care toward the decedent. The Ninth Circuit, reversing the district court, first stated that the safety manual, as a matter of federal law, imposes no special duty on the Government, citing numerous cases. The Court then stated that even if it conceded that such a duty was created by the manual, the Government was still not negligent because the resident engineer did not act negligently in waiving the regulation for the project. The Court stated:

"In California a private person would assume no tort duty by reaching this conclusion and the government engineer cannot be held to a higher standard."

The conclusion is important because, under the FTCA, the United States is liable for the negligence of its employees:

"under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

Accordingly, the law of Nevada governs the liability of the United States for this alleged tort. The Government is to be held to the same standard as a private person in Nevada, and therefore, under the FTCA, the federal safety regulations incorporated into the contract cannot create a duty on the Government which does not exist on a private person.

Therefore, the AEC owed no duty to the decedent Thomas McGarry by reason of the contract between REECo and the AEC or by reason of federal statutes or regulations.

**B.**

*Duties Imposed upon the AEC by Nevada Statute*

The plaintiffs argue that Nevada Revised Statutes § 618.250 created a duty in the AEC and that the deceased was proximately injured because of the AEC's duty breach. NRS 618.250 provides:

"Construction of unsafe places of employment prohibited.

No employer, *owner* or lessee of any real property in this state shall construct or cause to be constructed any place of employment that is not safe." (Emphasis added.)

The plaintiffs allege that this statute imposes an affirmative duty upon the owner of the premises to make the premises safe for all persons invited thereon to work.

No Nevada cases applying NRS 618.250 could be found. It is doubtful that the Nevada state courts would give NRS 618.250 the interpretation the plaintiffs here seek. The statute pertains to constructing or causing to be constructed a place of employment that is not safe. It would indeed strain the statute to label the remote, uninhabited, 1400-square-mile Nevada Test Site a "place of employment" which was constructed or caused to be constructed by the AEC. NRS 618.250 can be read logically to mean that the owner of real property will not allow the construction of any unsafe structure or building where workers will be employed.

Assuming, arguendo, that the Nevada Test Site was a place of employment which was allowed to be constructed by the AEC so that there was an affirmative duty, the plaintiffs' theory falters because there was no duty breach by the AEC. The plaintiffs seem to

536

argue that the duty created by NRS 618.250 is some type of nondelegable duty which cannot be passed on to the Government contractor which maintained the Test Site. The plaintiffs do not explain why this statute should be read to impose a nondelegable duty upon the owner of real estate. The statute merely creates the duty and is silent about how the duty shall be discharged. The creation of a nondelegable duty should certainly be more explicit.

The duty created by NRS 618.250 was performed by the AEC pursuant to the terms of its contract with REECo. The contract requires the contractor (REECo) to comply with all state laws and regulations pertaining to worker safety. (Contract, page 12, paragraph 7; page A–17, paragraph A–27, Ptf. Exhibit No. 6.) The plaintiffs have conceded that the AEC was not negligent in choosing to proceed by using independent contractors and was not negligent in the selection of REECo as the independent contractor to manage and maintain the Nevada Test Site. (Plaintiffs' post-trial brief, page 11, line 30.) The AEC is liable for the negligence of its own employees and not liable for the negligence of REECo employees.

Therefore, even if NRS 618.250 is read to impose a duty upon the AEC as the owner of the Nevada Test Site, the plaintiffs' theory fails for lack of a breach of duty by the AEC to plaintiffs' decedent.

C.

*Duties Imposed upon the AEC by Reason of its Ownership, Possession and Control of the Nevada Test Site*

The parties agree that the property known as the Nevada Test Site has been withdrawn from the public domain for use by the AEC. (Pretrial Order, page 2, line 11.) The plaintiffs argue that the AEC, as the possessor and owner of the Nevada Test Site, has a duty under Nevada law to exercise reasonable care to make the premises safe for its invitees and to warn its invitees of any dangerous conditions thereon. The theory of the plaintiff is explained by Prosser (3rd ed. 1964) at page 395:

". . . as to those who enter premises upon business which concerns the occupier, and upon his invitation express or implied, the latter is under an affirmative duty to protect them, not only against dangers of which he knows, but also against those which with reasonable care he might discover."

The rule includes ". . . independent contractors doing work on the premises, and the workmen employed by such contractors . . ." The special duty owed invitees extends to all parts of the premises to which the purpose of the invitation may reasonably be expected to take him.

A recent case cited by both parties which implements the landowner theory of liability in a FTCA case is Stanley v. United States, 347 F.Supp. 1088 (N.D. Me.1972). The United States owned the 979.5 foot radio tower from which the plaintiff's son fell to his death while he was painting it. The decedent worked for a subcontractor who was doing the actual painting for the prime contractor hired by the Government. The radio tower consists of three "legs" twelve feet apart, to which are attached triangular horizontal platforms at intervals of approximately seventy feet. A ladder extends to each platform from the previous one. The platform at the upper end of any ladder has a ladder hole cut in the platform. The ladder hole is unguarded. It was the job of the decedent to stand at the various platforms and paint as far up the tower as he could reach with his long-handled brush. Two more experienced painters were doing the painting above the portion which could be reached from the platform. The two more experienced painters heard a clatter and saw the decedent falling through the ladder hole and down onto the next platform.

The district court held that under Maine law the United States had a duty as the owner of the land and towers to use due care to provide its business invitees a reasonably safe place to work. Under Maine law the independent contractors, as well as their employees, are invitees. The law of Maine is that a landowner is normally not liable to third parties for dangers that are open and obvious, but there is an exception where obviousness may not be enough. The district court held that the ladder hole was an obvious danger, especially to the Navy men who must constantly climb it, but the obviousness of the danger was not sufficient protection for the painter who undergoes "a relaxation of his alertness" and forgets where the hole is as he paints above his head. The Court held that the failure of the United States to provide guard rails along the ladder holes in the platforms constituted a breach of its duty to use due care to provide its business invitees a reasonably safe place to work. The prime contractor had provided by contract with the Government to take proper safety precautions during the job. The Court held that the danger could have been obviated had the prime contractor provided proper safety belts, and therefore the prime contractor failed in its contractual undertaking to take proper safety precautions and was obligated to reimburse the United States for all damages found due to the plaintiff.

The First Circuit Court of Appeals reversed the district court, Stanley v. United States, 476 F.2d 606 (1st Cir. 1973). The Court of Appeals first pointed out that the plaintiff could not sue the employer of the deceased because of the receipt of workmen's compensation. The Court of Appeals characterized the district court holding as finding the Government negligent for defective design of the tower and finding the prime contractor liable to the Government for breach of its undertaking to provide proper safety precautions. On appeal the prime contractor argued that the Government was not liable and, accordingly, the contractor could not be liable over to the Government.

The Court of Appeals agreed with the district court interpretation of the Maine law on the subject, but disagreed with the application. The Court of Appeals viewed the entire record and concluded that the open ladder holes may have been hazardous to the inexperienced painter on the tower, but the guardrails, if they had been put around the holes, would have created a hazard for the Navy men who were the frequent users of the tower. The Court said, at page 609:

"The expert testimony, accordingly, comes to this. The platform, without rails, was a dangerous place for a painter, particularly an inexperienced painter, to work. It was perhaps more dangerous than such a painter might appreciate. On the other hand, as to all other persons, who manifestly used the tower far more frequently, and who would have to traverse apertures 26 times for a single ascent, guardrails were not only not needed, but were to some degree contraindicated. Furthermore, the special danger applicable to painters could, as the court found, be obviated by the use of safety belts with a tag line attachment."

Having absolved the Government of negligence, the Court of Appeals continued:

"In the case at bar the government was not dealing with ordinary business invitees, but with specialists, of whom more could be expected. Cf. Gowdy v. United States, 6 Cir., 1969, 412 F.2d 525, cert. denied 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425;[6] Barrett v. Foster Grant Co., 1 Cir., 1971, 450 F.2d 1146. It had provided in its contract that the contractor should attend to safety. The court's 'hold[ing] that the United States should reasonably have foreseen that painters, particularly if inexperienced, might lose both sight and consciousness of the nearby, unguarded ladder hole in the otherwise safe platform and back, trip or otherwise fall into it

538

unless safety precautions were taken,' is at best irrelevant in the absence of any evidence that the government should have supposed that the contractor would employ inexperienced workers on such a dangerous job and, more particularly, that it would fail in its obligation to take the safety precautions its workers required."

The Court emphasized, in footnote 6, that:

" . . . there was a safer way the present plaintiff could have done this work, namely with a safety belt that was the contractor's responsibility."

The Court concluded, at page 610:

"The government did what it should, and cannot be held liable. There is, accordingly, nothing for which the third-party defendant must indemnify it, and both complaints must be dismissed."

■ The *Stanley* case is important because it demonstrates the application of the landowner duty theory to a FTCA case and shows that the duty can be discharged on the Government's part by making the contractor responsible for the safety of the employees. If the contract delegates the responsibility to the contractor, the Government would be liable only on a theory of faulty contractor selection or if the Government had reason to believe the contractor was not performing the safety measures required by the contract.

■ In the case at bar, to ascertain the AEC's duty imposed by its status as landowner, the Court must look at the law of Nevada. It is clear that McGarry, as the employee of REECo, was an invitee of the AEC. McCready v. Southern Pac. Co., 26 F.2d 569 (9th Cir. 1928), and Fuchs v. Mapes, 74 Nev. 366, 332 P.2d 1002. Generally, the owner of real property owes an invitee the duty of ordinary care. If a peril is hidden, latent or concealed, ordinary care requires an owner, with actual or constructive knowledge of the peril, to warn the invited guest who is without such knowledge. On the other hand, if the

danger is obvious, ordinary care does not require a warning from the owner because obviousness serves the same purpose. Gunlock v. New Frontier Hotel, 78 Nev. 182, 370 P.2d 682 (1962), and Worth v. Read, 79 Nev. 351, 384 P.2d 1017. In a later Nevada case, the Nevada Supreme Court adopted section 343A of the Restatement 2d of Torts, which states:

"A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness."

Rogers v. Tore, Ltd., 85 Nev. 548, 459 P.2d 214. This means that the invitee's knowledge of the danger does not inevitably bar recovery.

■ In the case at bar, whether the power lines were "latent" or "obvious", and whether the decedent had knowledge of them or not, is not important since the AEC, as in the *Stanley* case, 476 F.2d 606, supra, had contracted the safety precautions to REECo. The AEC and REECo contract required the contractor to take all of the necessary safety precautions to protect the safety of McGarry. Therefore, as in *Stanley*, the Government fulfilled its duty of ordinary care and there was no evidence that the Government should have supposed that the contractor would employ inexperienced workers or that the contractor would fail in its obligation to take the appropriate safety measures.

The plaintiffs appear to argue that the duty imposed upon the AEC by reason of its possession and ownership of the Nevada Test Site is a "nondelegable" duty, but no authority is provided to show the duty is nondelegable in the State of Nevada. In the *Stanley* case, in which Maine law was applied, the law appears very similar to Nevada law. There was no mention in *Stanley* of the nondelegable nature of the duty owed by the Government as landowner. In fact, the Court of Appeals stated that the

Government "did what it should" and approved of the delegation of the duty to the prime contractor. In the instant case, as in *Stanley*, the AEC fulfilled its duty by contracting the responsibility to the contractor, REECo.

Even if the landowner's duty to invitees could be said to be a nondelegable duty, there is still the question of whether this theory of liability would be recognized under the FTCA. It must be remembered that the state law applies in an FTCA action, but there can be no absolute, strict, vicarious or imputed theories of liability. Prosser (3rd Ed. 1964, page 404) recognizes that the duty may be nondelegable, but it is clear that the nondelegable nature of the landowner's duty is based upon the concept of imputed or vicarious liability. As Dean Prosser states:

> "It is generally agreed that the obligation as to the condition of the premises is of such importance that it cannot be delegated, and that the occupier will be *liable for the negligence of an independent contractor* to whom he entrusts maintenance and repair." (Emphasis added.)

In the instant case, if the landowner's duty to invitees in Nevada could be said to be a nondelegable duty, it is evident that the landowner would be liable for the negligence of the contractor via a theory of vicarious liability. See Besner v. Central Trust Co., 230 N.Y. 357, 130 N.E. 577 (1921). The United States cannot be held liable for the negligence of a contractor. United States v. Dooley, 231 F.2d 423 (9th Cir. 1955), and Roberson v. United States, 382 F.2d 714 (9th Cir. 1967).

Therefore, the AEC fulfilled the duty imposed upon it by reason of its ownership and possession of the Nevada Test Site by exercising ordinary care when it contracted the safety responsibility to REECo. If the duty was a nondelegable one, the liability would be via vicarious liability, a theory not cognizable under the FTCA. The plaintiffs cannot recover for the alleged breach of a duty owed by the AEC by reason of its ownership, possession and control of the Nevada Test Site.

## D.

*Duties Imposed upon the AEC by Reason of It Being the Owner, Supplier and Distributor of Electricity throughout the Nevada Test Site*

The defendant has admitted that the power lines, circuit breakers, transformers, substations and other electrical facilities on the Nevada Test Site, and the electricity supplied through such facilities are owned by the defendant United States of America. (Pretrial Order, page 2, paragraph 3.) Though the defendant owned the electrical facilities, it is equally clear that the contractor, REECo, was to manage, operate and maintain the Nevada Test Site, including the "Maintenance, repair and operation of utility plants and distribution systems including . . . electrical". (Contract between AEC and REECo, paragraphs 1 and 2a.(3), page 2.) Also, according to General Provision A-27, page A-17, of the contract, REECo was responsible for job safety at the Nevada Test Site.

The parties concede, and this Court agrees, that REECo, the employer of the deceased and the contractor responsible for operating the Test Site, was negligent in a number of ways in the operation of the electrical distribution system and the manner in which the deceased was supervised at the scene of the accident. But the plaintiffs argue that despite the duties and breaches thereof by REECo, the defendant had duties which were personal to it and owed directly to the deceased. Even though REECo had a duty and could have prevented the accident by complying with its duty, the plaintiffs argue that the defendant had a corresponding personal duty which arose from its ownership of the inherently dangerous electrical distribution system.

The plaintiffs appear to be actually combining two distinct theories of duty

**540**

owed by the defendant to the deceased. The duties are normally treated separately but, due to the peculiar facts of this case, they have coalesced. First, the plaintiffs argue that the defendant, as the supplier and distributor of electricity on the premises and the owner of the electrical facilities through which such electricity is supplied, owed a high degree of care, commensurate with the danger presented by such electrical facilities and electricity, to anyone who foreseeably would come into contact therewith. Second, the plaintiffs argue that the defendant, as the employer of the independent contractor, REECo, owes a nondelegable duty to exercise reasonable care to prevent harm to third persons, including the employees of the independent contractor, when the work the independent contractor is performing is inherently or intrinsically dangerous work. The plaintiffs argue that the drilling operation which the deceased was performing was inherently dangerous work because of the proximity of the high voltage power transmission lines. The plaintiffs then combine the duty arising from the ownership of the electrical facilities with the duty arising from the employment of an independent contractor to perform an inherently dangerous task and allege that the defendant United States breached this combined nondelegable duty.

Basically, the defendant acknowledges the existence of the first duty which arises from the ownership of the electrical distribution system, but argues that the entire duty was delegated by contract to REECo and therefore there was no duty breach by the defendant. With regard to the second duty which arises from the employment of REECo by the defendant to perform an inherently dangerous job, the defendant argues, first, that the job of drilling holes is not an inherently dangerous task and, second, that the nondelegable duty here referred to is not cognizable under the FTCA because it is a type of strict or vicarious liability.

For clarity, the two duties will first be discussed separately before the combined effect is analyzed.

The duty of care created by the ownership of electrical facilities and electricity is a higher standard of care than is normally required by a landowner. This higher standard of care has been described in various terms. In *McCormick v. United States*, 159 F.Supp. 920 (D.Minn.1959), a painter was injured while painting Government barracks. The Court sustained the painter's FTCA claim and explained the law of Minnesota thusly:

"In other words, one who erects electric lines carrying high voltage currents, as in the instant case, must exercise a degree of care commensurate with the danger to be apprehended and arising out of contact therewith or current jumping or escaping therefrom. Knowledge of such danger by the proprietor thereof, requires warning, either vocal or in writing, and if in writing, it must be in closer proximity to the point of danger than that evidenced in this case."

In *Hamilton v. United States*, 143 F. Supp. 179 (W.D.Pa.1956), the Court held that the Government owed a duty to the employee of a contractor who was electrocuted, but denied recovery because the employee was contributorily negligent. The Court applied Pennsylvania law and said:

". . . . a supplier of electrical current is bound to use the very highest degree of care practicable to persons who may be lawfully in proximity to, and liable to come in contact with, its dangerous installations."

The standard of care required is the same in most states, although it may be stated differently. As stated in 26 Am. Jur.2d Electricity, Gas, and Steam § 42:

"The degree of care required to be used in the production, distribution, and use of electricity is stated in various terms which, perhaps, convey merely one idea. To declare that the

utmost care must be used to prevent injury sounds different in statement than to say that ordinary care must be used in view of all the circumstances; but when analyzed, the meaning is not far different, for the ordinary care required under the circumstances is, in its practical application and in view of the highly dangerous character of electricity, a relatively high degree of care."

This high standard of care does not apply solely to power companies. As stated in 26 Am.Jur.2d Electricity, Gas, and Steam § 51:

"An owner of land who has erected and maintained on his land high-voltage electric wires is under the same duty of safeguarding from injury members of the public who may come in contact with them as are electric companies engaged in the transmission of electric power."

 The high standard of care imposed upon the supplier of electrical current has been held to be nondelegable by some courts. 26 Am.Jur.2d Electricity, Gas, and Steam § 53, pages 260 and 261. While the standard of care may be of the highest nature, it is clear that the basis of liability is negligence and is not strict or absolute liability. 69 A.L.R.2d 98. Therefore, this high standard of care is a type of liability cognizable under the FTCA.

Counsel have not cited, and the Court has not found, any Nevada cases dealing with the duty imposed upon the owner and supplier of electricity. The Court therefore should follow the common law rule applied in all jurisdictions and apply a high standard of care commensurate with the danger presented by the electrical facilities at the Nevada Test Site. There are numerous FTCA cases which deal with electricity and the duty owed by the owner and supplier. Several of the relevant cases will be discussed before turning to the application of the duty in the instant case.

An important case is Pierce v. United States, 142 F.Supp. 721 (E.D.Tenn. 1955), which was an action for damages against the United States under the FTCA for injuries received by the plaintiff who was working as an electrical lineman for a subcontractor to an independent contractor for the Government at the Volunteer Ordnance Works (VOW), a Government-owned munitions plant which was deactivated after World War II and was being reactivated as a result of the Korean War. The plaintiff was injured when he came into contact with an energized power line on a structure in close proximity to the substation on the premises. The Court, in holding the United States liable, even though it was the responsibility of the contractor to be sure all power was turned off, stated:

"The electrical current furnished for VOW was purchased by the government and delivered to it at the site of VOW, where it was fed into the project over government owned power lines existing on the premises. The government, through the Ordnance Corps and the Corps of Engineers, had possession of the premises.

"The Corps of Engineers had a contracting officer at the site whose duties included keeping track of the work, settling disputes and, in general, seeing that the work required by the government was being satisfactorily performed.

"It is plaintiff's contention that the government, in furnishing power for the premises, was dealing with a highly dangerous substance and, under Tennessee law, owed a duty to all persons rightfully on the premises to exercise due care for their safety commensurate with the danger involved. Further that the government knew or should have known that possible injuries might result from such electricity unless adequate precautions were taken to protect the workmen on the power lines from its dangerous propensities. Plaintiff asserts that the government failed to take such precautions and that his injuries resulted from its negligence in failing to do so.

Indeed it is asserted that electricity is an imminently dangerous substance and that, under Tennessee law, the government had a nondelegable duty to take adequate precautions to safeguard the workers on the project.

" * * *

" * * *

"It is true that an employer is not generally liable for the negligence of an independent contractor. However, there is an exception in those cases where, from the nature of the particular work or project, in the natural course of events mischievous consequences can be expected to arise unless means are adopted to prevent it. In such cases the owner-employer is held to be under a nondelegable duty to see that appropriate preventative measures are adopted.

"This enlightened rule has been recognized and given application by the Tennessee courts. Davis v. Cam-Wyman Lumber Co., 126 Tenn. 576, 150 S.W. 545; International Harvester Co. v. Sartain, 32 Tenn.App. 425, 222 S.W.2d 854, certiorari denied by Supreme Court, March 11, 1949.

"Electricity has traditionally been considered extremely dangerous and the duty of exercising a high degree of care is placed upon those dealing with it. Walpole v. Tennessee Light & Power Co., 19 Tenn.App. 352, 89 S.W.2d 174; Tennessee Electric Power Co. v. Sims, 21 Tenn.App. 233, 108 S.W.2d 801. In fact the effect of the pronouncements in the Sartain case, supra, is to hold it an imminently dangerous agency which places upon the individual dealing with it, a nondelegable duty to see that reasonable means are taken to protect those who come into contact with it. Failure to fulfill that duty results in liability on the part of such individual, even though the plaintiff's injury resulted in whole or in part from the acts or omissions of an independent contractor employed to perform the particular work.

"The government was in possession of the premises through its agencies, the Corps of Ordnance and Engineers. Indeed counsel conceded during the trial that the power lines and substation involved had not been turned over to Atlas. The government had contracted with the Electric Power Board of Chattanooga to furnish power for the premises. The power was delivered by the utility to the site of VOW and brought onto the premises over government owned lines. The government thereupon became a supplier of electricity, subject to the same high degree of care to protect persons properly upon the premises as is required of electric power companies. International Harvester Co. v. Sartain, supra.

" * * *

"Although much of the inspection work had been delegated by contract to Patchen and Zimmerman, it also appears that the Corps of Engineers had some inspectors in the field who were to see that the electrical work was progressing satisfactorily. And of course by virtue of its own contracts, the government knew that the work to be done would necessitate linemen being in and about both the lines and substations of VOW. It also knew that, unless proper steps were taken to see it was killed, high-voltage power would be on those lines and substations while the work progressed.

"Despite these facts the government took absolutely no steps either to correct the defects in the substation or, failing that, to see that the power was off while the crew of linemen to which plaintiff belonged performed their work upon it.

" * * *

" * * *

"The government was responsible for the condition of the substation and, under the Tennessee decisions, for failing to see that adequate precautions were taken to protect the

plaintiff from the high-voltage power which it purchased and placed there

. . .

" * * *

" * * *

"Neither can the Court accept the government's contention that plaintiff is barred from recovery because he has failed to show negligence on the part of any employee of the government. The premises were under the control of the government. Under its contracts with the companies doing the rehabilitation work, the contracting officer of the Corps of Engineers had the right to approve the work, settle disputes, authorize changes, etc. The dangerous structure was on government premises and the power was purchased and transmitted by the government to be utilized on the premises.

"The government can function only through its agents and employees. The plaintiff has shown to the Court's satisfaction that the representatives of the government in possession of VOW totally failed in their duty to safeguard plaintiff from injury as it was their duty to do under Tennessee law. Under the circumstances it is immaterial that plaintiff did not establish the particular named official who was responsible for such duties. The Court knows of no case holding it a prerequisite to recovery that one injured through the negligence of a government employee must show the identity of such individual, so long as the duty and breach thereof is established.

"Lastly it is argued that even though the substation may have been defective and high-voltage electricity considered an imminently dangerous agency, no liability rests upon the government solely because of its ownership of the premises. Certainly the Act and the cases dealing with it would seem to require some negligent act before liability attaches. For the purposes of this decision the Court assumes that such is the requirement of

the law. But this is of no benefit to the government.

"As the doctrine of nondelegable duty is applied in this state it is not a rule of strict liability regardless of fault. Negligence is required, the sole effect of the doctrine being to preclude the owner-employer from escaping liability for negligence which was a proximate cause of injury on the ground that others may have been guilty of negligence, which was also a proximate cause of injury. As in any other case the basis of liability is negligence. This was made perfectly clear in the Sartain case, supra, where the Court pointed out [32 Tenn.App. 425, 222 S.W.2d [854], 866] that the rule 'is one requiring ordinary care under the circumstances, which may be a high degree of care actually, but is not a rule of absolute liability regardless of the exercise of ordinary care, so to make the owner an insurer * * *'. Therefore, if the Act requires negligence, the Tennessee cases are in complete conformity with the requirement, liability being imposed upon proof of failure to exercise due care."

The district court was affirmed by the Court of Appeals, United States v. Pierce, 235 F.2d 466 (6th Cir. 1956), which held:

"The court [District Court] found that the government, which had possession of the premises through its agencies, failed to take adequate precautions to protect workmen on the power lines and that this constituted negligence of the government's employees. . . .

" * * *

"The judgment is affirmed upon the grounds and for the reasons stated in the memorandum opinion of the District Court, 142 F.Supp. 721."

Similarly, in United States v. Haskins, 395 F.2d 503 (10th Cir. 1968), an action was brought by the heirs of a deceased employee of an independent contractor which had contracted with the Depart-

ment of the Army to paint the exterior of the buildings at Fort Carson, Colorado. The decedent's foreman, also an employee of the independent contractor, stopped at the place where the decedent was working to take him to lunch. He attempted to remove the decedent's ladder to another position and in doing so the ladder came into contact with an uninsulated high voltage line running parallel to the building, causing the foreman to receive an electrical shock. In attempting to rescue him, the decedent was killed, although the evidence did not indicate exactly how. In holding the United States liable, the Court said:

"There is substantial evidence in the record to support the trial court's finding that the government was negligent. 'Electricity has traditionally been considered extremely dangerous and the duty of exercising a high degree of care is placed upon those dealing with it.' Pierce v. United States, 142 F.Supp. 721, 728–729 (E.D.Tenn., S.D.1955), aff'd per curiam, 235 F.2d 466 (6th Cir. 1956). The degree of care exercised must be commensurate with the danger. McCormick v. United States, 159 F.Supp. 920, 924 (D. Minn.1958). However, the government did not have to guard against possible eventualities—only probabilities. Currence v. Denver Tramway Corporation, 132 Colo. 328, 287 P.2d 967 (1955). Under the facts of this case there was a likelihood or reasonable probability of human contact with the high voltage wire. The danger should have been foreseen or anticipated; however, the evidence showed no warning signs of any kind were maintained in the immediate area where the accident occurred. No specific warnings were given to Transco or its employees. The fact the electrical wiring in other areas of Fort Carson was strung so the neutral wire was closer to the structures than the high voltage wire indicates a safer procedure could have been followed in the accident area. It is true that in constructing and maintaining its lines the government had complied with applicable safety codes; however, it is felt such compliance is not conclusive evidence of due care but is only one factor to be considered. An unsafe condition existed which, it is felt, was not obvious to the painters-invitees of the government. There was a duty to warn of that unsafe condition. Stancil v. United States, 196 F.Supp. 478, 480–481 (E.D.Va.1961)."

United States v. Pierce, 235 F.2d 466, supra, and United States v. Haskins, 395 F.2d 503, supra, are directly on point. In both cases an employee of an independent contractor sustained injury as a result of negligent maintenance of an electrical distribution system, and the failure to warn the employee with regard to such system. In both cases the Court held that, although the independent contractor as the employer of the plaintiff could have discharged the duty, the Government nonetheless had the duty and was negligent in failing to discharge it, so that the liability was imposed for the Government's breach of its own duty, rather than for the independent contractor's breach of a similar and corresponding duty.

In Stancil v. United States, 196 F. Supp. 478 (E.D.Va.1961), the district court, on remand after reversal of a judgment in favor of the Government by the Fourth Circuit in Stancil v. United States, 267 F.2d 268 (4th Cir. 1959), held the Government liable for the death of a painter who was electrocuted when he came into contact with a power line which had not been disconnected before he was sent to paint a portion of Pier 1 at the Hampton Roads Army Terminal in Norfolk, Virginia. The district court stated:

"This factual situation brings the case within the rule that, at places where others have a right and may reasonably be expected to go for work, business, or pleasure, there is a duty to keep wires carrying a dangerous voltage properly insulated, or otherwise warn an invitee of an unsafe condition not open and obvious to a

person in the exercise of reasonable care. Trimyer v. Norfolk Tallow Company, 192 Va. 776, 66 S.E.2d 441; City of Danville v. Thornton, 110 Va. 541, 66 S.E. 839; Blackwell v. Hub Furniture Corp., 163 Va. 621, 177 S.E. 64. As Moyer was the designated party to determine where workmen should be so occupied, and the Government was not interested in this phase of the details other than to follow the overall plan that where practicable the work was to be done in sections, the Government, as the owner of the project, is not exonerated where the work to be performed was inherently hazardous in the area wherein the work could be reasonably anticipated. Bowers v. Town of Martinsville, 156 Va. 497, 159 S.E. 196; Epperson v. De Jarnette, 164 Va. 482, 180 S.E. 412. That Houska was an independent contactor is clear. Boyd, Higgins & Goforth v. Mahone, 142 Va. 690, 128 S.E. 259. But this fact, standing alone, does not relieve the owner of the non-delegable duty to warn where hazardous work is being performed within the scope of the invitation."

The *Stancil* case is important for three different propositions: (1) the fact that an independent contractor created the risk does not absolve the owner of the electrical distribution system of his duty; (2) the owner has a duty to warn of the existence of power wires where others mights reasonably be expected to go for work; (3) ordinary work (painting) becomes extra-hazardous work when it has to be performed within close proximity to electrical wires.

In Gowdy v. United States, 412 F.2d 525 (6th Cir. 1969), the plaintiff, an employee of an independent contractor which had a contract with the Coast Guard to install electrical equipment at a machinery house that was part of a lighthouse owned by the Government on Lake Michigan, was injured while hoisting some equipment to the flat roof of the machinery house. There was no guardrail on the roof and he fell off. The Court pointed out that the Government was not required to exercise control in that situation over its independent contractors and was not liable for its failure to do so because hoisting machinery was not an inherently dangerous activity, and further pointed out that the right to inspect did not create such a duty. The equipment being used by the contractor's employee was owned and furnished by the contractor and could have been operated from the ground as well as the roof. However, the Court pointed out that as possessor of the premises the Government had a duty to make the premises safe for its invitees, including employees of independent contractors, and, if the absence of a guardrail had not admittedly been known to the plaintiff, it could have been liable for a failure to warn him, stating:

"Since the Government may not be held liable without fault, it follows that the only basis for liability is negligence, if any, of Government employees in failing to warn Gowdy of the danger or in failing to provide guardrails to prevent the fall. But the Government was not required to warn Gowdy of something which he admitted that he already *new*, (sic) namely, that no guardrail was on the flat roof and that it was dangerous for him to work too close to the edge of the roof because he might lose his balance and fall. Neither was the Government, under such circumstances, required to provide a guardrail. Thus we hold that the Government, as the owner of this flat roof, could not have anticipated that a reasonably careful workman would not protect himself from the known and obvious danger here involved."

The implication of the *Gowdy* case is that if the task were an inherently dangerous one or if the Government could have reasonably foreseen danger to the workman, then the Government would have had a duty to exercise some control over its independent contractor and the Government's right of inspection would be a method for exercising this control.

Turning to the facts of the instant case, the Government's liability appears to turn on whether its duty to exercise a high standard of care commensurate with the risk involved, which arises because of its ownership of the electrical distribution system, was completely discharged by delegating to REECo full responsibility for the operation, management and maintenance of the Test Site and all job safety at the Test Site. Basically, the questions are whether the duty is delegable and, if it is, did the Government fully discharge the high standard of care by the alleged delegation to REECo. The plaintiffs have argued that the duty is "nondelegable". The discussion of nondelegable duty and the issue of whether such a basis for liability is cognizable under the FTCA will be discussed infra with the portion of the opinion pertaining to the hiring of an independent contractor to perform intrinsically dangerous work. As will be seen within, even if the duty arising from the ownership of the electrical distribution system is held to be a delegable duty, the attempted delegation by the AEC, without any follow-up or inspection for compliance whatsoever, did not fully discharge the duty owed to the deceased.

The evidence is sufficient to show that the AEC had knowledge of the presence of the high voltage lines in the area of the accident. The testimony of Mr. Spavin, the Safety Chief of the AEC, reveals that no safety engineer for the AEC had knowledge that the exploratory hole in question was to be drilled so close to the power line. In fact, the testimony established that if an AEC safety engineer had known of the proximity of the test hole to the transmission line, the safety engineer would have intervened and required the test hole to be moved away from the power line. Eventually, after the accident, the location of the exploratory hole was moved 500 feet to the east so that no anchor hole would be near the transmission line. But just because no safety personnel of the AEC had knowledge of the exact location of the exploratory hole does not mean the Government did not have knowledge of its location. The evidence established that the AEC had approved the extensive work for that area and therefore the Government had knowledge that extensive drilling was planned in the locality of the extra-hazardous transmission lines. The AEC thus having knowledge of the activity which was to take place in the area of the transmission line and there being a reasonable likelihood of an accident to a worker if adequate precautions were not taken, what did the AEC do to discharge this duty? The Government argues that its entire obligation was discharged by the delegation to REECo of the responsibility for the management and operation of the Test Site. While such a delegation may suffice to discharge the normal duty owed by a landowner when an extra-hazardous situation is not involved, it would seem that more is required when the duty to be discharged by delegation is one which imposes a high standard of care. The contractual delegation, without any inspection to ascertain whether the independent contractor was fulfilling its safety duties, may suffice to discharge the standard duty of due care, but such a delegation without more is not commensurate with the risk involved with the electrical distribution system. The Government is charged with knowledge of the extensive work which was to be performed in the area of the transmission line, yet no precautions or inspections were undertaken by the AEC to guarantee the safety of the workers in that area.

The evidence at the trial proved conclusively that there were numerous safety measures which could have and should have been taken in order to insure the safety of the workmen around the transmission line. For example, the manual reclosure of the electrical circuit after the automatic reclosure failure should have occurred in a manner more consonant with the nature of the danger involved; the transmission line could have been run underground around the

site of the drilling activity; warning signs could have been placed prominently about the area; the transmission line could have been "hot red tagged" (no reclosure at all if there is a fault on the line) at the substation, or the line could have been "dead red tagged" (the current shut off) while the workmen were in the area. Any of these precautions probably would have saved the life of the deceased. It is true, as all parties acknowledge, that REECo was clearly negligent because none of the safety precautions were taken, but the fact remains that the AEC did nothing to ascertain whether REECo was fulfilling its contractual obligation to safely provide for the workers. The fact that REECo was negligent does not foreclose the possibility of the comparable negligence of the AEC for breaching its own personal duty to use due care commensurate with the risk involved. The risk in this situation was great, yet the AEC did not monitor REECo or make any special effort to see that the safety of the workers was protected. The AEC did not act commensurate with the high risk involved. The AEC therefore did not fulfill its duty to exercise care commensurate with the grave danger which existed. REECo should have instituted numerous safety precautions, but the AEC also should have done more to protect the safety of the workers near the transmission line. The Government is not liable for the negligent acts of REECo, but, rather, is liable for the breach of its own personal duty. The distinction is well illustrated in Benson v. United States, 150 F.Supp. 610 (D.C. Cal.1957), in which the Court, holding that the United States' motion to dismiss an action brought by an employee of an independent contractor who was injured on a walkway at the Folsom Reservoir should be denied, pointed out:

"While the United States may not be held liable under the Federal Tort Claims Act for the negligence of an independent contractor, where it is not shown that any agent or employee of the Government was negligent in any respect, Strangi v. United States, 5 Cir., 211 F.2d 305; Hopson v. United States, D.C., 136 F.Supp. 804; and see United States v. Hull, 1 Cir., 195 F.2d 64, 67 (*dictum*), it is clear that the Government *is* liable for its own negligence in the same manner that an employer of an independent contractor is held liable for his own negligence under the applicable local law. Title 28 U.S.C.A. § 2674; Pierce v. United States, D.C., 142 F.Supp. 721, affirmed 6 Cir., 235 F.2d 466." (Emphasis supplied.)

The Government argues that no AEC safety personnel had knowledge of the exact location of the exploratory hole but, as explained above, the Government, by its approval of the extensive work in the area of the transmission line, had knowledge of the potential presence of workmen in and around the extra-hazardous area. The testimony revealed that the AEC safety personnel would have prevented the drilling of the exploratory hole next to the transmission line if they had known about it. The testimony of Mr. Smith, the Assistant Manager of Engineering and Logistics for the AEC, revealed that the AEC has the power under the contract with REECo to shut down the work of any contractor whenever the AEC determines that an unsafe condition or practice exists. One of the functions of the AEC safety engineers is to see that the contractors adhere to proper safety measures. This power to shut down the project whenever an unsafe practice occurs is important because it preserves for the AEC a method for fulfilling its duty which arises due to workmen being in an extra-hazardous area. The AEC safety personnel may not have known the location of the exploratory hole, but the AEC did. The lack of adequate knowledge on the part of the AEC safety personnel when the AEC possessed the requisite information is itself a further duty breach by the AEC. To properly fulfill its existing duty, the AEC should have had a better information dissemination procedure so that the

AEC safety personnel would have been apprised of the workmen possibly being in the area of the dangerous transmission line. Had the AEC safety engineers known of the location of the exploratory hole, the drilling would not have commenced and the accident undoubtedly could have been prevented. This is certainly not an' onerous task to place upon the AEC; a better information dispersal procedure or more safety personnel could have prevented the mishap. The burden is not excessive; it is merely commensurate with the risk involved with the ownership of the electrical distribution system.

Even, arguendo, if it were determined that the AEC's approval of the extensive work in the area of the transmission line did not give the AEC knowledge of the potentially dangerous situation, the AEC still would not have fulfilled the high standard of care commensurate with the risk involved. When the risk is so great, the owner of the electrical distribution system certainly cannot evade the high standard of care by choosing to remain ignorant of activity in the area of the transmission line. At the very least, the owner of the known extra-hazardous instrumentality, in order to fulfill the strict duty, should implement a procedure by which the owner will be informed of any activity around the dangerous instrumentality. That is to say, the AEC should have a procedure by which it is made aware of any work taking place near any dangerous transmission line. Failure to implement such a procedure which would make the AEC aware of activity near the electrical distribution system so that the high standard of care can be fulfilled by monitoring the work of the contractor constitutes a duty breach. It simply does not fulfill the duty to exercise a standard of care commensurate with the risk for the AEC to say it had no knowledge of the presence of the workmen in the danger zone; the AEC must take steps to know about their presence and see that adequate safety measures are followed.

Although the retention of a right of inspection where there is no duty to inspect will not create such a duty, if the duty to inspect and supervise the activities of the independent contractor does exist, the failure to exercise the right of inspection so reserved in the contract will be a breach of that pre-existing duty attendant upon the ownership, supply and distribution of a dangerous instrumentality such as electricity, and the resulting liability is for the owner's own negligence. Larive v. United States, 318 F.Supp. 119 (D.C.S. D.1970); Benson v. United States, 150 F.Supp. 610 (D.C.Cal.1957); Pierce v. United States, 142 F.Supp. 721 (E.D. Tenn.1955), affirmed 235 F.2d 467 (6th Cir. 1956); United States v. Haskins, 395 F.2d 503 (10th Cir. 1968).

Therefore, in summary, the attempted delegation by the AEC to REECo of the duty arising from the ownership, control and distribution of the electrical distribution system was not commensurate with the high degree of risk involved and the AEC thusly breached its duty.

Aside from the duty arising from the distribution and ownership of the electrical facilities at the Nevada Test Site, the plaintiffs rely on a second theory of liability to create another duty owed by the Government. The plaintiffs argue that the defendant, as the employer of the independent contractor REECo, owes a nondelegable duty to exercise due care to prevent harm to third persons, including the employees of the independent contractor, when the work the independent contractor is performing is inherently or intrinsically dangerous work. The plaintiffs then combine the duty arising from the ownership of the electrical facilities with the duty arising from the employment of an independent contractor to perform an inherently dangerous task and allege that the defendant United States breached this combined nondelegable duty. The defendant argues, first, that the job of drilling holes is not an inherently dangerous task, and, second, that the nondelegable duty here re-

ferred to is not cognizable under the FTCA because it is a type of strict or vicarious liability. The following discussion of a nondelegable duty will also be pertinent to the duty discussed above which arose from the distribution and ownership of electricity because the plaintiffs also allege that that duty is nondelegable.

The crux of the dispute between the parties is whether or not the nondelegable duty theory of liability is cognizable under the FTCA. The defendant argues that a nondelegable duty theory of liability is actually absolute, vicarious or imputed liability for which the United States cannot be liable under the FTCA. The plaintiffs argue that a nondelegable duty theory of liability is not strict or vicarious liability but, rather, makes the United States liable for its own negligence and not for the negligence of the independent contractor. Both parties agree that the United States is immune from certain types of liability which may be imposed upon private persons because of the limitation of the waiver of sovereign immunity only to liability for negligent acts or omissions of its employees. By reason of this limitation on the waiver of immunity under the FTCA, the United States cannot be held liable for a claim arising under the doctrine of strict liability or absolute liability without a showing of fault on the part of the United States. Laird v. Nelms, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972); Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); Bartholomae Corp. v. United States, 253 F.2d 716 (9th Cir. 1957); Strangi v. United States, 211 F.2d 305 (5th Cir. 1954); United States v. Taylor, 236 F.2d 649 (6th Cir. 1956); Wright v. United States, 404 F.2d 244 (7th Cir. 1968); and Huffmaster v. United States, 186 F.Supp. 120 (D.C.Cal.1960). Similarly, by reason of the limitation of the waiver of the immunity to the negligent acts or omission of its own employees, the United States cannot be charged with liability based on the imputation of negligence

of an independent contractor, even in the area of extra-hazardous activities, where the United States itself is not negligent. Laird v. Nelms, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499, supra; Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, supra; Gowdy v. United States, 412 F.2d 525, supra; Mahoney v. United States, 220 F.Supp. 823 (E.D.Tenn.1963); Strangi v. United States, 211 F.2d 305, supra; Dushon v. United States, 243 F.2d 451, 17 Alaska 245, supra; United States v. Dooley, 231 F.2d 423, supra; Richardson v. United States, 251 F.Supp. 107 (W.D.Tenn.1966); United States v. Page, 350 F.2d 28, supra; Hopson v. United States, 136 F.Supp. 804 (W.D. Ark.1956); Roberson v. United States, 382 F.2d 714, supra; Kirk v. United States, 270 F.2d 110 (9th Cir. 1959); and Grogan v. United States, 341 F.2d 39, supra. The defendant argues that the above cases prevent the application of a nondelegable duty theory of liability under the FTCA, but the plaintiffs argue that such a theory is entirely consistent with the above rules because the United States is to be held liable for its own negligence.

Is a nondelegable duty theory of liability cognizable under the FTCA? The defendant first relies on Dalehite v. United States, supra, and other cases which quote the *Dalehite* "rule" without analyzing it. In Wright v. United States, 404 F.2d 244 (7th Cir. 1968), the Court stated the rule as follows:

> "The United States is liable under the Federal Tort Claims Act only for damages 'caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.' 28 U.S.C. § 1346(b). Liability under the Act 'does not arise by virtue either of United States ownership of an "inherently dangerous commodity" or property, or of engaging in an "extra-hazardous" activity.' Dalehite v. United States, 346 U.S. 15, 45, 73 S.Ct. 956, 972, 97 L.Ed. 1427 (1953). Consequently, the plaintiffs

cannot recover under their theory of strict liability."

The defendant seizes upon the *Dalehite* quotation and argues that the United States cannot be held liable because of its ownership of the electrical distribution system or because of its engaging an independent contractor to perform an extra-hazardous activity. The argument has surface appeal but misconstrues both the *Dalehite* case and the plaintiffs' theory of recovery. The *Dalehite* "rule" is that the United States cannot be held liable under the FTCA without a negligent act or omission by a Government employee. True, the ownership of an inherently dangerous commodity, standing alone, cannot create liability in the United States, but if there is a negligent act or omission by a Government employee then liability will attach. The plaintiffs do not argue that the mere ownership of an inherently dangerous commodity or the mere engaging in an extra-hazardous activity by the United States will create liability but, rather, argue that there was a negligent act or omission by a Government employee with regard to the ownership of the inherently dangerous commodity and the engagement in the extra-hazardous activity.

There are other cases relied upon by the defendant which apparently seem to dispose of the question. In Mahoney v. United States, 220 F.Supp. 823 (E.D. Tenn.1963), the Court states flatly:

"The Government cannot be charged with negligence of the employees of an independent contractor under the non-delegable rule of local law."

In United States v. Page, 350 F.2d 28 (10th Cir. 1965), the Court said:

"The general law on the subject casts serious doubts as to whether the doctrine of nondelegable duty as here involved applies to injuries to employees of the independent contractor."

In the recent Ninth Circuit case of Jeffries v. United States, 477 F.2d 52 (9th Cir. 1973), the Court said:

"There is substantial doubt as to whether the 'nondelegable duty' theory is available under the Federal Tort Claims Act."

The defendant relies on these cases for its assertion that the nondelegable duty theory is not available under the FTCA because the theory is one of absolute or vicarious liability. Even Prosser, 3rd ed., p. 483, explains the nondelegable duty theory in terms of vicarious liability:

"But the cases of 'non-delegable duty' go further, and hold the employer liable for the negligence of the contractor, although he has himself done everything that could reasonably be required of him. They are thus cases of vicarious liability."

The error in the defendant's reasoning is in the assumption that the nondelegable duty theory is identical throughout the United States. Under the FTCA, the United States is liable for the negligence of its employees:

". . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

Therefore, when a court decides that "The Government cannot be charged with negligence of the employees of an independent contractor under the nondelegable rule of local law" (Mahoney v. United States, 220 F.Supp. 823, supra), the court is ruling that the nondelegable theory in that state is a type of vicarious liability and therefore not available under the FTCA. The rule of that case would be of precedential value in another FTCA case in another state only if the other state has the same type of nondelegable duty rule. As will be seen, various states have different types of a nondelegable duty theory of liability and in some states the theory is not one of vicarious or imputed liability. Therefore, the cases which flatly state the rule that the nondelegable duty rule is not available under the FTCA are of little help as a national FTCA standard.

There are several important cases which discuss the applicability of the nondelegable duty rule under the FTCA. In Hopson v. United States, 136 F.Supp. 804 (W.D.Ark.1956), the Court said:

"The remaining contention of plaintiff is that the work was inherently dangerous and that the Government could not escape liability by delegating the work to an independent contractor. The Arkansas rule in this regard is stated in Southwestern Bell Telephone Co. v. Smith, 220 Ark. 223, 225, 247 S.W.2d 16, 17, as follows:

' "While it is true that as a general rule, the employer would not be liable for the negligence of an independent contractor, there are exceptions to this rule. One exception is that where the work to be performed is inherently dangerous, as here, the employer will not be permitted to escape liability for negligent injury to the property of another, by an employee, to whom the employer has delegated, or contracted, the performance of the work." '

"See also, McKennon v. Jones, 219 Ark. 671, 244 S.W.2d 138; Kennedy v. Clayton, 216 Ark. 851, 227 S.W.2d 934; Giem v. Williams, 215 Ark. 705, 222 S.W.2d 800.

"Thus, under the Arkansas law the Government if a private person would be liable for the negligence, if any, on the part of the employees of NFOC, and the question is presented as to whether the Government would be liable for such alleged negligence under the Tort Claims Act. The question presents two distinct problems, i. e., (1) whether the nondelegable rule is a type of absolute liability condemned by the Dalehite case, or (2) whether the nondelegable rule is applicable to federal tort claim actions since the negligent actor is not an employee of the United States.

"As to the first problem, there is little question but that the nondelegable rule is a type of absolute liability without fault, inasmuch as the contractor is held liable for the negligence of the independent contractor's employees even though there is no fault whatsoever on the part of the contractor. However, the doctrine of respondeat superior in itself is also a type of absolute liability without fault, since the master is held liable for the negligence of his servant even though the master himself is guilty of no breach of care. See, Comment, Absolute Liability in Arkansas, 8 Ark. Law Review 83, 88.

"The Court is of the opinion that the nondelegable rule is comparable to the respondeat superior rule and is not the type of absolute liability without fault which was condemned in the Dalehite case. Contra, Strangi v. United States, supra, at page 308 of 211 F.2d. Stated differently, the Dalehite case merely construes the Tort Claims Act to require 'a negligent act' and to be inapplicable to liability based solely upon 'ownership of an "inherently dangerous commodity" or property, or of engaging in an "extra hazardous" activity'. Dalehite v. United States, supra, at page 45 of 346 U.S., at page 972 of 73 S.Ct.

"It would seem then that inasmuch as the nondelegable rule requires a negligent act on the part of an employee of an independent contractor, the rule would not be a type of absolute liability prohibited by the Dalehite case.

"This brings the Court to the second problem, that is, whether the United States can be charged with liability based upon the negligent act of an employee of an independent contractor under the nondelegable rule applicable under the local law.

" * * *

"The Court has found only one case in which the specific problem was discussed. In United States v. Hull, 1 Cir., 195 F.2d 64, at page 67 the Court said:

'Likewise, there are certain cases where under local law a private person may be liable for injuries resulting

from the negligence of a carefully selected independent contractor. Restatement of Torts § 416 et seq. Presumably the United States would not be subject to liability in such a case under the Federal Tort Claims Act, for it may well be that the negligent independent contractor would not be deemed an "employee" of the government within the meaning of § 1346(b).'

"The Court is convinced that the above quoted dictum in the Hull case is a correct statement of the law. The Supreme Court has interpreted the Tort Claims Act 'to require clear relinquishment of sovereign immunity to give jurisdiction for tort actions'. Dalehite v. United States, supra, at page 31 of 346 U.S., at page 965 of 73 S.Ct. By its terms the Act is specifically limited to claims based upon negligent or wrongful acts or omissions of 'any employee of the Government', and there is nothing in the Act to indicate that Congress intended to extend the liability of the United States to actions founded upon negligent or wrongful acts or omissions of employees of independent contractors.

"In other words, the Tort Claims Act can be invoked 'only on a "negligent or wrongful act or omission" of an employee'. Dalehite v. United States, supra, at page 44 of 346 U.S., at page 972 of 73 S.Ct. And the Act requires that the employee be an 'employee of the Government'. Therefore, liability under the Act cannot be predicated upon the alleged negligence of an independent contractor or its employees, when said contractor and employees are not employees of the United States."

The *Hopson* Court therefore ruled that the nondelegable duty rule under Arkansas law is not barred under the FTCA because it is a theory of absolute liability but, rather, ruled that the nondelegable duty rule is barred because the act was by the independent contractor rather than by a Government employee and that would be vicarious liability.

In Emelwon, Inc. v. United States, 391 F.2d 9 (5th Cir. 1968), the Court said:

"It is clear the United States may not be held liable without fault. Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); Strangi v. United States, 211 F.2d 305 (5th Cir. 1954); Hopson v. United States, 136 F.Supp. 804 (W.D.Ark. 1956). Nor do the terms of the Act permit the negligence of an independent contractor to be imputed to the United States. See United States v. Page, 350 F.2d 28 (10th Cir. 1965). But there is another possibility—despite the existence of an employer-independent contractor relationship Florida law casts directly upon the employer itself (here the United States) legal duties which its employees may have failed to discharge. Florida recognizes such duties under at least two applicable theories.

"First, Florida follows the rule that where an employer gains knowledge of a dangerous situation created by an independent contractor it may incur liability through its failure to halt the operation or otherwise remove the danger. Maule Industries, Inc. v. Messana, 62 So.2d 737 (Fla.1953); Breeding's Dania Drug Co. v. Runyon, 147 Fla. 123, 2 So.2d 376 (1941); Peairs v. Florida Publishing Co., 132 So.2d 561 (Fla.App.1961).

"Second, Florida recognizes the principle that one who employs an independent contractor to engage in certain types of activity has a 'nondelegable duty' to see to it that the independent contractor carries out his task in a non-negligent manner. The employer's liability is not absolute, nor is he held vicariously liable for the negligence of the independent contractor. Rather liability is imposed on the employer for his own failure to exercise reasonable care in a situation in which the work is sufficiently dangerous that the employer himself has a

duty to third persons who may sustain injuries from the work unless proper precautions are taken in the performance thereof. The taking of such precautions is a duty which the employer may not delegate to his independent contractor so as to evade liability. Should injury occur under such circumstances of sufficiently great danger the employer is liable for the breach of his own 'nondelegable duty' to take precautions against harm to third parties. Florida Power & Light Co. v. Price, 170 So.2d 293 (Fla.1964), articulates the extent of danger required to bring the non-delegable duty into existence as 'inherently or intrinsically dangerous work.' While the rule is not limited to landlord cases, see Peairs v. Florida Publishing Co., supra, it is clearly stated by the Florida Supreme Court in a recent landlord case. Mai Kai, Inc. v. Colucci, 205 So.2d 291 (Fla.1967):

> "The duty to exercise * * * reasonable case (sic) is nondelegable in the sense that a contract for its performance by another will not necessarily eliminate an owner's responsibility. The duty, however, remains one of due care or reasonable care in preventing or correcting an unsafe condition, as opposed to absolute liability for a contractor's negligence."

In the *Emelwon* case, the dangerous activity was the aerial spraying of dangerous herbicides and insecticides. The Court concluded that the district court should not have directed a verdict for the Government because the Florida type of nondelegable duty was in fact cognizable under the FTCA because the Government would be liable for its own negligence, rather than vicariously liable.

The existence of two distinct types of nondelegable duty theory is explained in a footnote in *Emelwon*, supra, at page 11, where the Court said:

> "The general rule seems to be that an employer who has a 'nondelegable duty' is 'liable for the negligence of the contractor, although he has himself done everything that could reasonably be required of him.' Prosser, Torts § 70, at 483 (3d ed. 1964), and cases cited there. In Florida, however, the nondelegable duty concept imposes a different burden—the employer is not held absolutely liable but is accountable only for his own negligence.
>
> " * * * *
>
> "Here we are concerned only with the Florida rule and express no views as to whether the nondelegable duty rule current in other jurisdictions could be applied against the government in a Tort Claims Act case. Compare Hopson v. United States, 136 F.Supp. 804 (W.D.Ark.1956)."

In H. L. Properties, Inc. v. Aerojet-General Corp., 331 F.Supp. 1006 (S.D. Fla.1971), the District Court followed the *Emelwon* case and held the Florida type nondelegable duty rule available under the FTCA:

> "It is well-established that the Government cannot be held liable without fault. Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). However, under the rationale of Emelwon, Inc. v. United States, 391 F.2d 9 (5th Cir. 1968), cert. den. 393 U.S. 841, 89 S.Ct. 119, 21 L.Ed.2d 111, the Government could be held liable under either of two theories of Florida law, both of which impose liability upon an employer of an independent contractor for its own negligence.
>
> "The first theory of Florida law imposes a duty upon an employer who discovers a dangerous situation created by its independent contractor either to halt the operation or otherwise remove the danger. Maule Industries, Inc. v. Messana, 62 So.2d 737 (Fla. 1953); Peairs v. Florida Publishing Co., 132 So.2d 561 (1st D.C.A.Fla. 1961).
>
> "The second theory of Florida law imposes a non-delegable duty on the employer to exercise reasonable care to prevent harm to third persons when

the independent contractor is performing inherently or intrinsically dangerous work. Florida Power & Light Co. v. Price, 170 So.2d 293 (Fla.1964).

"* * * *

". . . The court finds that the Government had a non-delegable duty to assure that Aerojet-General Corporation performed its task in a non-negligent manner. The sole question for decision is whether the Government negligently breached this duty.

"Under Article III of the contract between the defendants, NASA retained technical direction of the project. The evidence shows that this clause merely gave NASA the power to assure that the technical results of the test-firing would be as contemplated under the contract.

"The contract also gave the Contracting Officer the authority both to terminate the contract and to impose upon Aerojet-General Corporation any safety and health requirements deemed necessary. The Court notes these provisions only to show that the Government had not relinquished total control of the operation to its independent contractor. . . .

"* * * *

"* * * *

"The Court finds that the Government, in contracting with Aerojet-General Corporation for the performance of an inherently dangerous project, had a non-delegable duty to exercise reasonable care to prevent harm to third persons caused by Aerojet-General Corporation. . . ."

The defendant seeks to distinguish the *Aerojet-General* case from the instant case because the injury (damage to fruit and plants when rocket motor was test-fired during a very light shower) was to third persons (owners and lessees of land), rather than to employees of the independent contractor. The distinction is of no consequence. The recent Ninth Circuit case of Thorne v. United States, 479 F.2d 804 (9th Cir. 1973), follows the *Emelwon* rationale in a FTCA suit by an employee of an independent contractor and the Court never mentioned the alleged distinction raised by the defendant here.

Before determining which nondelegable duty theory, if any, exists in Nevada, a better understanding of "nondelegable duty" can be obtained from American Law Institute Restatement of Torts 2d, from cases interpreting the Restatement of Torts 2d and from recent Ninth Circuit cases which discuss nondelegable duty under the FTCA.

What appears to be the "general rule" of nondelegable duty, i. e., the type discussed in the *Hopson* case, 136 F.Supp. 804, supra, which was a form of vicarious liability, is found in the Restatement of Torts 2d at § 416 and § 427A. The Reporter's Notes explain that §§ 416 and 427A represent different forms of statement of the same general rule and have been applied more or less interchangeably in the same types of cases. The rules are stated as follows:

"§ 416. Work Dangerous in Absence of Special Precautions

One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

"§ 427A. Work Involving Abnormally Dangerous Activity

One who employs an independent contractor to do work which the employer knows or has reason to know to involve an abnormally dangerous activity, is subject to liability to the same extent as the contractor for physical harm to others caused by the activity."

It is clear that these two rules represent a form of imputed liability. In the Introductory Note to § 416, it is stated:

"The rules stated in the following §§ 416–429, unlike those stated in the preceding §§ 410–415, do not rest upon any personal negligence of the employer. They are rules of vicarious liability, making the employer liable for the negligence of the independent contractor, irrespective of whether the employer has himself been at fault."

Prosser, Torts, § 70 at 484 (3d ed. 1964) describes Restatement of Torts 2d, § 416, as a form of vicarious liability, and United States v. Hull, 195 F.2d 64 (1st Cir. 1952) so holds. Therefore, it is certain that § 416 is a description of the "general rule" of nondelegable duty which would not be available under the FTCA because it is a theory of vicarious liability.

Where is the Florida type of nondelegable duty found in the Restatement of Torts 2d? As stated in the previously quoted introductory note to § 416, the sections which deal with the personal negligence of the employer are §§ 410–415. The only section close to the Florida type of nondelegable duty is § 413, which states:

"§ 413. Duty to Provide for Taking of Precautions Against Dangers Involved in Work Entrusted to Contractor

One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer

(a) fails to provide in the contract that the contractor shall take such precautions, or

(b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions."

While § 413 is a form of direct liability upon the employer of a contractor, rather than a form of vicarious liability, it is readily evident that § 413 is not the Florida type of nondelegable duty theory. Section 413 liability can be avoided by an employer by simply delegating the responsibility to the contractor in the contract (see § 413(a)), yet under the Florida type nondelegable duty there cannot be such a delegation.

The difference between § 413 and § 416 liability is noted in the recent Ninth Circuit case of United States v. De-Camp, 478 F.2d 1188 (9th Cir. 1973), a FTCA case in which a contractor's employee was killed while operating a bulldozer at a Government project. The Court said, at footnote 3, page 1193:

" * * *

" * * *

"Not really an exception, as such, to the independent contractor rule, Section 413 imposes direct liability upon the employer of an independent contractor if the employer himself fails to take appropriate special precautions. This section thus contrasts sharply with Section 416, which imposes vicarious liability on the employer for the negligence of the independent contractor."

The Court held that there was no § 413 liability in that case since the Government did not in fact fail to take any special precautions required in the circumstances of the case.

In the instant case, the plaintiffs are not relying on § 413 liability but, rather, on the Florida type nondelegable duty theory of liability. The defendant in the instant case would not be liable under § 413 because the contract between REECo and the AEC provided that the contractor should provide all safety precautions and this would absolve the employer of liability according to § 413(a). Nor can the plaintiffs rely on § 416 liability because it is a form of vicarious liability not cognizable under the FTCA. The plaintiffs rely on a nondelegable

duty theory of the Florida type which would be similar to § 413 except that the duty cannot be delegated. It should be noted that in *Emelwon* and *Aerojet-General*, the cases recognizing the availability of the nondelegable duty theory under the FTCA, the courts discuss liability without any reliance on the Restatement of Torts 2d, and the Florida state cases which discuss the nondelegable duty theory do not rely on §§ 413, 416 or 427A. The nondelegable duty theory which imposes liability upon the employer of the contractor for the employer's own negligence appears to be a theory which is not found in the Restatement of Torts 2d.

The defendant relies heavily on United States v. Page, supra, 350 F.2d 28 (10th Cir. 1965), cert. den. 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470, and Eutsler v. United States, 376 F.2d 634 (10th Cir. 1967). With the exception that two separate accidents were involved in the two cases, the facts are virtually indistinguishable. In each case, three employees of a Government contractor, Hercules, died in an explosion while performing work at Bacchus, Utah, related to the development of a solid fuel rocket propellant. The Bacchus plant was owned by the contractor and the Government supplied equipment and supplies, the title to which was in the Government. In each case the work was being performed pursuant to the same contract between Hercules and the United States Air Force, among the provisions of which was a requirement that Hercules comply with certain specific safety regulations. The contract reserved for the Government the right to inspect the plant and the work being performed by the contractor.

In the first case, United States v. Page, supra, the district court found the Government liable for not properly supervising the safety practices of the contractor and liable under the rule stated in Restatement of Torts 2d, § 427. The Court of Appeals reversed and held that the fact that the Government contract may reserve to the United States the right to inspect the work and facilities of the independent contractor, and the right to stop the work, does not in itself override or alter the general rule of nonliability for torts of the contractor because no duty is created to employees or third parties. The Court of Appeals then went on to dispose of the § 427 liability:

"The trial court concluded that 'although not necessary to the decision of the case' because of the inherently dangerous nature of the work, the Government would be liable under Utah law as expressed in Section 427 of the Restatement of Torts for the negligence of the independent contractor. Section 427 provides that:

'One who employs an independent contractor to do work which is inherently dangerous to others is subject to liability for bodily harm caused to them by the contractor's failure to exercise reasonable care to prevent harm resulting from the dangerous character of the work.'

There is no question but that Hercules was a responsible independent contractor properly selected. Also, liability under this theory is not predicated on actual control or interference exercised or reserved by the United States, and the record shows there was none. Rather, the duty imposed upon the United States, if any, stems entirely from the nature of the activity and the hazards it creates to third persons.

"The general law on the subject casts serious doubts as to whether the doctrine of nondelegable duty as here involved applies to injuries to employees of the independent contractor. Corban v. Skelly Oil Co., 256 F.2d 775 (5th Cir.), expressly held that it did not so apply. Similar holdings appear in Galbraith v. United States, 296 F. 2d 631 (2d Cir.); Sword, Houston Fire & Cas. Ins. Co., Intervener v. Gulf Oil Corp., 251 F.2d 829 (5th Cir.); Hurst, Employers Cas. Co., Intervener v. Gulf Oil Corp., 251 F.2d 836 (5th Cir.); Cagle v. McQueen,

200 F.2d 186 (5th Cir.). The Utah Supreme Court apparently has not been faced directly with this question, but the view taken by the courts in the above cited cases is supported by dictum in Dayton v. Free, 46 Utah 277, 148 P. 408, and nothing to the contrary has been advanced. But in any event it must be first decided whether an independent contractor is an 'employee' within the meaning of 28 U.S.C.A. § 1346(b) so as to render the United States liable for the contractor's negligence under the Federal Tort Claims Act.

"The Supreme Court in the Dalehite case has interpreted the Tort Claims Act to 'require clear relinquishment of sovereign immunity to give jurisdiction for tort actions.' Dalehite v. United States, 346 U.S. 15, at 31, 73 S.Ct. 956, at 965. The Tort Claims Act provides that the United States District Courts shall have jurisdiction of claims against the United States for money damages:

' * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any *employee of the Government* while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' 28 U.S.C. A. § 1346(b). (Emphasis added.)

Thus, a prerequisite to liability of the United States under the Act is that the act or omission be by an 'employee of the United States.' An independent contractor is not an 'employee' of the Government and recovery cannot therefore be had against the United States for Hercules' negligent acts. Dushon v. United States, 243 F.2d 451, 17 Alaska 245 (9th Cir.) (dictum); Strangi v. United States, 211 F.2d 305 (5th Cir.); United States v. Hull, 195 F.2d 64 (1st Cir.) (dictum); Nyquist v. United States, 226 F.Supp. 884 (D.Mont.); Benson v. United States, 150 F.Supp. 610 (N.D.Cal.); Hopson v. United States, 136 F.Supp. 804 (W.D.Ark.)."

Therefore, the Court of Appeals ruled, in *Page*, that § 427 nondelegable duty is not available under the FTCA because it is a type of vicarious liability.

In the next case, Eutsler v. United States, supra, 376 F.2d 634, the plaintiffs tried a different theory of liability for the same fact situation. The theory, as stated by the plaintiffs in that case, was that:

"there is a direct common law duty [owed to employees of an independent contractor] on the part of the United States, or any other contractee, when it directs an independent contractor to deal with inherently dangerous substances, to provide adequate safety regulations or to see that adequate safety regulations are followed by the independent contractor."

The plaintiffs then proceeded to advance § 413 of the Restatement of Torts 2d as their theory of recovery:

"Appellants urge that Page must be distinguished from the present case on grounds that the theories of liability are different. Page, it is said, turned upon considerations of a nondelegable duty and imputed negligence arising out of contract, while here the premise of simple negligence based upon the duty to exercise reasonable care is advanced. The foundation for this latter theory is section 413 of the Restatement of Torts which provides:

'One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer

(a) fails to provide in the contract that the contractor shall take such precautions, or

(b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions.'

"Although this court made no direct reference to section 413 of the Restatement in its consideration of the issues in Page, we think it clear that both the reasoning and disposition of that case negatives appellants' contentions here and that section 413 would be persuasive to appellants' arguments only if the phrase 'to others' as contained therein pertained to employees of the independent contractor. One court, against quite different factual circumstances, lends comfort to appellants. Woolen v. Aerojet General Corp., 57 Cal.2d 407, 20 Cal.Rptr. 12, 369 P.2d 708. But the generally accepted rule is clearly to the contrary. E. g., Corban v. Skelly Oil Co., 5 Cir., 256 F.2d 775; Richardson v. United States, W.D.Tenn., 251 F.Supp. 107; Epperly v. City of Seattle, 65 Wash.2d 777, 399 P.2d 591; Welker v. Kennecott Copper Co., 1 Ariz. App. 395, 403 P.2d 330; and authorities cited."

The decision in *Eutsler* turned upon the interpretation of § 413 which the Utah courts apply. The Court decided that the words "to others" in § 413:

"One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm *to others* unless special precautions are taken . . ." (Emphasis added.)

pertain to third persons only and do not pertain to employees of the contractor. Therefore, since under Utah law the employees do not come within the § 413 theory of recovery, the Court disposed of the § 413 claim without having to decide whether it was an available theory of recovery under the FTCA.

In the instant case, the plaintiffs realize that § 416 or § 427 liability is not available under the FTCA and they further do not rely on § 413 liability; rather, the plaintiffs assert the Florida type of nondelegable duty which would im-

pose liability on the United States for its own negligent act.

There are three important recent Ninth Circuit cases which involve the nondelegable duty theory under the FTCA. In Jeffries v. United States, supra, 477 F.2d 52 (9th Cir. 1973), the Court stated in dicta:

"There is substantial doubt as to whether the 'nondelegable duty' theory is available under the Federal Tort Claims Act."

The Court cited United States v. Page, supra, 350 F.2d 28. This dicta statement was directed to the question whether the nondelegable duty theory would apply where the result would be to impose vicarious liability upon the United States for negligence of the contractor.

In the next Ninth Circuit case, United States v. DeCamp, supra, 478 F.2d 1188, the employee of a Government contractor was killed while he operated his bulldozer at a Government clearance project. A Government engineer told the contractor that bulldozer canopies would not be needed on the project, in spite of a provision of the Corps of Engineers' safety manual which seemed to require the canopies. The District Court found that canopies were not normally used for this type of a project in that locality so that the contractor was not negligent, but found the Government negligent because the Government engineer did not adhere to the federal regulations requiring the canopies. The Court of Appeals agreed that the contractor was not negligent and further held that the Government was not either. In essence, the Court held that the Government, in a FTCA suit, is to be treated as a person where the accident occurred. The Court held that the Government engineer had exercised his discretion in deciding whether canopies would be needed and said:

" . . . in California [where the accident occurred] a private person would assume no tort duty by reaching this conclusion, and the govern-

ment engineer could not be held to a higher standard."

Of special interest is the DeCamp Court's discussion of § 416 of the Restatement of Torts 2d:

"The plaintiff's reliance upon Van Arsdale v. Hollinger, 68 Cal.2d 245, 66 Cal.Rptr. 20, 437 P.2d 508 (1968) is misplaced. Van Arsdale, which engrafts Section 416 of the Restatement (Second) of Torts onto the statutory liability of public entities in California, merely carves out another exception to the independent contractor rule in order to impute the negligence of an independent contractor to the employer of the contractor. Since Section 416 is predicated initially upon the presence of negligence by the contractor, the section is inapposite when, as here, the contractor is not negligent. We thus need not consider whether the federal government can be vicariously liable in any event under the Tort Claims Act, although we note in passing that many courts confronting this issue have answered in the negative. See Fisher v. United States, 441 F.2d 1288 (3d Cir. 1971); Market Insurance Co. v. United States, 415 F.2d 459 (5th Cir. 1969); Gowdy v. United States, supra; Wright v. United States, 404 F.2d 244 (7th Cir. 1968); Roberson v. United States, supra; Lipka v. United States, supra [369 F.2d 288 (2d Cir.)]; United States v. Page, supra."

Since the contractor was not negligent, the *DeCamp* Court did not get to the issue of whether § 416 vicarious liability is available under the FTCA.

The next Ninth Circuit case which is very relevant is Thorne v. United States, supra, 479 F.2d 804. The plaintiff in the FTCA suit was an employee of a contractor which had contracted with the Department of the Interior, Bureau of Reclamation, to construct a spillway as part of a dam in California. The plaintiff was injured as a large slab of shale rock broke loose on the upper side of the "toe" trench he was digging on a very steep slope. There was undisputed evidence which demonstrated that the excavation of the particular trench across the face of the steep spillway was a highly dangerous operation. The district court granted a motion in favor of the defense at the close of the plaintiff's case. The Court of Appeals reversed the district court and remanded the case for a new trial. The opinion is very enlightening and will be quoted extensively:

"The one case to which our attention has been directed and the only case which our research has revealed, which is almost exactly in point on the application of state law to the factual background before us, is Emelwon, Inc. v. United States, 391 F.2d 9 (CA5 1968), cert. denied 393 U.S. 841, 89 S.Ct. 119, 21 L.Ed.2d 111. There, as here, the appellants sought recovery for damages to their growing crops, in connection with a spraying operation. The district court directed a verdict for the United States on the ground that the state of Florida, which carried on the spraying operations causing the damage, was neither an agent nor an employee of the United States, but was an independent contractor. In reversing the judgment, the Fifth Circuit recognized that the United States could not be held liable without fault and that the doctrine of strict liability did not apply, citing among others, Dalehite v. United States, 346 U.S. 15, 44–45, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), and also recognized that under ordinary circumstances the United States could not be held liable for the negligence of an independent contractor. After acknowledging these rules, the court then went on to hold that there were at least two applicable theories of Florida law under which the United States would be liable. First, the Florida rule that the owner or employer may incur liability through its failure to halt an operation when it gains knowledge of a dangerous situation, which might be created by an independent contractor. Second, the Flor-

ida rule that one who employs an independent contractor to engage in certain types of dangerous activity has a 'non-delegable duty' and must see to it that the independent contractor carries out his task in a nonnegligent manner. On the second point, the court went on to say that the employer's liability was not absolute, nor was he held vicariously liable for the negligence of the independent contractor. Instead, liability was imposed on the employer for his own failure to exercise reasonable care in a situation in which the work is sufficiently dangerous that the employer himself has a duty to third persons who may sustain injuries from the work unless proper precautions are taken. The court then went on to hold that the spraying of herbicides or insecticides was an activity which was sufficiently dangerous to warrant the application of the Florida non-delegable duty rule.

"A perusal of the California authorities convinces us that the law of that state is essentially the same as the Florida law before the Court in Emelwon, Inc., supra.

"Before we discuss the specific California cases, it is well to recognize that its courts have followed the proposition that one who employs an independent contractor is, as a general rule, not liable for the misconduct of the latter or his servants while acting within the scope of the contract. The idea responsible for this general rule of non-liability is the want of control and authority of the employer over the work, and the consequent harshness of the rule which would hold one responsible for the manner of conducting an enterprise over which he lacks the authority to direct the operations. However, the court recognizes that there are certain clear cut exceptions which, with increasing tendency, seem to overshadow in importance and scope the rule itself.

"At least one of these exceptions is here of importance. It is the duty imposed on an employer of an independent contractor for the misconduct of the latter in the performance of certain 'intrinsically dangerous' work. The policy of allocating to the owner or employer the risk incident to his activity is obvious when the activity carries with it extraordinary hazards to third persons. This duty is recognized as California law in the exhaustive opinion of Justice Peters in Van Arsdale v. Hollinger, 68 Cal. 2d 245, 66 Cal.Rptr. 20, 437 P.2d 508 (Cal.1968), a case comparable to the one before us. In Van Arsdale, an employee of a street improvement contractor was eradicating markings on a busy street. The City of Los Angeles and the contractor recognized that the street improvement work involved special hazards to the public and to the employees of the contractor. By the terms of the agreement, the contractor was required to provide flagmen, wearing red coats and carrying a red hat or sign. When plaintiff was injured, no flagmen were working and the plaintiff, the injured employee of the contractor, was not wearing a red or orange jacket. There, the court imposed liability on the City for its failure to exercise care in a situation in which the work was sufficiently dangerous that it had a duty to others who might sustain injuries from the work unless proper precautions were taken in the performance thereof. It went on to hold that the taking of such precautions was a duty which the city could not delegate to its independent contractor so as to evade liability. Under California law, the Bureau, in this case, was under a duty to exercise reasonable care to see that proper precautions were taken by the contractor. On the record before us, no such precautions were taken.

"While generally speaking, the mere reservation of a right to inspect work performed by an independent contractor, including the right to stop the work if precautions are not taken, does not impose upon the government

any duty of inspection or control, Roberson v. United States, 382 F.2d 714 (CA9 1967), this rule does not apply to a factual background, such as this, where the work is extra-dangerous. Although an extra-dangerous condition may have been involved in Roberson, the court refused to consider this problem for the reason that the issue had not been raised in the lower court. P. 718.

" * * *

"The Bureau attempts to distinguish between the facts in Van Arsdale and the facts before us on the ground that prior to the beginning of the work the government had no warning that 'particular risk of physical harm' would arise. This argument is foreclosed by the record. The government's plans and specifications under which the contract was let required the digging of this and other trenches across the face of a steep slope, which the government knew from its own surveys would be cut through shale rock. Beyond that, the government supervisors in charge were fully aware of the dangerous character of the work. Cases such as McDonald v. Shell Oil Co., 44 Cal.2d 785, 285 P.2d 902 (1955) and Anderson v. L. C. Smith Construction Co., supra [276 Cal.App.2d 436, 81 Cal. Rptr. 73], cited by Bureau, did not involve highly dangerous work, known to be such by the owner. In attempting to reconcile Emelwon, Inc. v. United States, supra, the Bureau completely misses the effect of that decision. Without citing authority, it makes a simple statement that the non-delegable duty asserted by appellant is not applicable to the United States under the Torts Claims Act. The argument completely ignores the California law on the subject and the fact that the Bureau had previous knowledge of the highly dangerous nature of the work and that its plans required the construction of the dangerous trenches. At least two of its supervisors were fully aware of the dangerous character of the work. The many cases cited by Bureau on sovereign immunity have no application. The Torts Claims Act, under which appellant is proceeding, waived this immunity to the extent of the provisions of the Act.

"The Bureau's reliance on United States v. Page, 350 F.2d 28 (CA10 1965), is also misplaced. A casual reading of the case reveals that the facts did not present a situation where the employees of the United States and the United States itself had actual knowledge of the dangerous nature of the work. Beyond that, the court did not directly pass on the problem before us. We quote from the opinion: 'The general law on the subject casts serious doubts on whether the doctrine of non-delegable duty, as here involved, applies to injuries to employees of the independent contractor.' P. 33. The court then went on to express the view that the Supreme Court of Utah would probably follow the rule as stated. Van Arsdale and other California cases demonstrate that the alleged Utah rule is not followed in California.'

" * * *

"The recent case of Jeffries v. United States, 477 F.2d 52 (CA9, 1973), is distinguishable. There, the author of the opinion expressed some doubt as to 'whether the "non-delegable duty" theory is available under the Federal Torts Claims Act.' P. 57. It is clear that the court's doubt was directed to the question whether the non-delegable duty theory would apply where the result would be to impose vicarious liability upon the United States for negligence of the contractor. The same is true of United States v. De-Camp, 478 F.2d 1188 (CA9, 1973). There, the majority held that there was no negligence on the part of either the contractor or the government. Here, both were negligent.

"Conclusion

"It is our considered judgment that the Bureau should have recognized that the construction of the trench across the face of the shale side hill, under the terms of the contract, would involve a peculiar risk of bodily harm to others unless special precautions were taken. Under California law, the Bureau had a non-delegable duty to exercise reasonable care, including the duty to see to it that the Contractor exercised such care. On these facts, the findings and conclusions of the trial judge are clearly erroneous."

In the *DeCamp* case, the Court did not decide the question of whether § 416 liability was available under the FTCA, but in the *DeCamp* Court's discussion of the California case Van Arsdale v. Hollinger, 68 Cal.2d 245, 66 Cal.Rptr. 20, 437 P.2d 508 (1968), the Court stated that *Van Arsdale* was a § 416 case and doubted whether it would be cognizable under the FTCA since § 416 is vicarious liability. But in the more recent *Thorne* case, the Court held that the Florida type nondelegable duty recognized in the Fifth Circuit *Emelwor* case is also a theory of liability available in the State of California, and the *Thorne* Court cited *Van Arsdale* for that conclusion. The *Thorne* case is interesting in attempting to ascertain exactly what the Florida type nondelegable duty theory is. In the Florida state cases which establish the nondelegable duty which were cited in *Emelwon*, the case which held the Florida type nondelegable duty to be available under the FTCA, the state cases did not mention § 416 of the Restatement of Torts 2d and the cases clearly were not cases of imputed liability. The *Thorne* case has held that California has the same type of nondelegable duty as Florida and cited *Van Arsdale*, a § 416 case, for authority. A careful perusal of *Van Arsdale* reveals that the case dealt with § 416, which section applies vicarious liability:

"There are numerous considerations which have led courts to depart from the rule of nonliability of a private employer for the torts of an independent contractor. Some of the principal ones are that the enterprise, notwithstanding the employment of the independent contractor, remains the employer's because he is the party primarily to be benefited by it, that he selects the contractor, is free to insist upon one who is financially responsible, and to demand indemnity from him, that the insurance necessary to distribute the risk is properly a cost of the employer's business, and that the performance of the duty of care is of great importance to the public. (See Prosser on Torts, supra, p. 481; 2 Harper and James, The Law of Torts (1956) p. 1406.)

"These considerations are present here, and the instant case comes within at least one of the well-recognized exceptions to the rule of nonliability for the acts of an independent contractor. This exception to the rule of nonliability is for work dangerous in the absence of special precautions. In section 416 of the Restatement Second of Torts, the exception is stated as follows: 'One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.'

" * * *

"This court has held that employees of an independent contractor come within the word 'others' as used in sections 413, 414, and 428 of the Restatement of Torts, which like section 416, set forth rules relating to the liability of one hiring an independent contractor. (Ferrel v. Safway Steel Scaffolds, 57 Cal.2d 651, 655, 21 Cal. Rptr. 575, 371 P.2d 311; Woolen v. Aerojet General Corp., 57 Cal.2d 407,

410–411, 20 Cal.Rptr. 12, 369 P.2d 708; Austin v. Riverside Portland Cement Co., 44 Cal.2d 225, 232–234, 282 P.2d 69; Snyder v. Southern Cal. Edison Co., supra, 44 Cal.2d 793, 798 et seq., 285 P.2d 912.) There is no reason to hold otherwise with respect to section 416. In Woolen v. Aerojet General Corp., supra, 57 Cal.2d 407, 411, 20 Cal.Rptr. 12, 369 P.2d 708, we disapproved a statement in a Court of Appeal case that the word 'others' as used in section 416 of the Restatement of Torts does not include employees of an independent contractor. It has recently been held that section 416 of the Restatement of Torts is applicable in California in an action by an employee of the independent contractor (McDonald v. City of Oakland, 223 Cal.App.2d 672, 677–678, 43 Cal.Rptr. 799), and other jurisdictions have extended the liability of one who hires an independent contractor to do dangerous work to the employees of the contractor (see 23 A.L.R. 1084, 1129–1135).

"Under the undisputed facts, the conditions precedent to the nondelegable duty imposed by section 416 appear as a matter of law. The undertaking here was to eradicate the markings of the white lines on a busy street while one of the three lanes was kept open to traffic. Absent special precautions to keep the traffic proceeding on the open lane from going into the other lanes, the work was highly dangerous. The necessity for such precautions was inherent in the work and was obvious before the work commenced. The contract of the city provided for special precautions, but under the plain language of section 416 this does not satisfy its duty. The work here is analogous to that considered by the Restatement Second in two of its illustrations to section 416, showing that the section applies to the danger of personal injury due to use of a highway because of failure to barricade highways or to warn motorists of dangerous conditions on or adjoining highways. (See Rest.2d Torts, § 416, Illus. 1, 3.)

"For the foregoing reasons it is clear that under the undisputed facts the city had a nondelegable duty to exercise due care, that an employee of the independent contractor could recover from the city for breach of that duty, and that the city could not avoid that duty by hiring an independent contractor."

Since *Thorne* held that the Florida type nondelegable duty theory of liability also exists in California, and since the *Thorne* Court relied on the California case *Van Arsdale*, which is a § 416 vicarious liability case, there appears to be a dilemma in defining precisely what the Florida type nondelegable duty consists of. Either the *Thorne* Court interprets § 416 as not being based on vicarious liability, or the Court decided that § 416 vicarious liability is available under the FTCA, or the Court decided that in California both the Florida type of nondelegable duty (available under the FTCA) and the "general rule" type of nondelegable duty (not available under the FTCA because vicarious liability) are available. The first option, that § 416 is not based on vicarious liability, is not tenable. The Restatement Reporter's Notes, as well as all other authority, recognizes § 416 as imputed liability. Further, United States v. DeCamp, supra, 478 F.2d 1188, at page 1193, footnote 3, recognizes § 416 as imposing "vicarious liability on the employer for the negligence of the independent contractor." The second option, that the *Thorne* Court decided that § 416 liability is available under the FTCA, is also untenable and inconsistent with the conclusion in *Thorne*. The Court made it clear that the Government, in *Thorne*, was being held liable for its own negligence and not for the negligence of the contractor. The *Thorne* Court, agreeing with *Emelwon*, said at page 810 of 479 F.2d:

"Under California law, the Bureau had a non-delegable duty to exercise

reasonable care, including the duty to see to it that the Contractor exercised such care."

The ineluctable conclusion is that the third option must be correct: the *Thorne* Court decided that in California the Florida type of nondelegable duty and the "general rule" vicarious type nondelegable duty must both exist. That is the only logical conclusion. The State of California has adopted § 413 and § 416 of the Restatement of Torts 2d. Walker v. Capistrano Saddle Club, 12 Cal.App.3d 894, 90 Cal.Rptr. 912 (1971); Courtell v. McEachen, 51 Cal.2d 448, 334 P.2d 870 (1959). Since California has recognized § 416 vicarious liability, and *Thorne* held that the Florida type nondelegable duty theory recognized in *Emelwon* is also available in California, both theories must be available. Apparently, in California the employer of a contractor for an inherently dangerous project can be vicariously liable for the negligence of the contractor in accordance with § 416 and the contractor can be liable under the Florida theory of nondelegable duty for his own personal negligence. But if it were a FTCA suit, only the latter theory would be available because the former is based on vicarious liability.

It is not logically inconsistent to recognize both types of nondelegable duty theories. In the majority of cases in which the FTCA was not involved, the parties would be interested only in the § 416 vicarious type of nondelegable duty in which the employer would be liable for the negligence of the contractor. There would be no need to resort to the Florida type of nondelegable duty to further impose liability on the employer for breaching his own nondelegable duty of due care. But in the FTCA cases in which the vicarious type of nondelegable duty is not available, then the plaintiff would resort to the Florida type of non-vicarious nondelegable duty to hold the Government liable for its own negligence. There is no inconsistency in holding that the vicarious type of nondelegable duty

is not available under the FTCA but still holding the Government liable for breaching its own nondelegable duty of due care. In the normal non-FTCA case, the latter duty would not be resorted to because it would be superfluous and encompassed in the former duty; the Florida type of nonvicarious nondelegable duty rears its head mainly in the FTCA cases where both types of duty exist.

 The FTCA makes the United States liable for personal injuries caused by the negligent or wrongful acts or omissions of an employee of the AEC while acting within the scope of his office or employment under any and all circumstances where the AEC, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. The accident occurred in Nevada. Consequently, Nevada law governs in determining whether a private person, and, therefore, the AEC, should be liable. The parties have referred the Court to no Nevada cases and the Court has found none which deal with the duties owned by the employer of a contractor engaged to perform a dangerous activity. In such instances, the Court must exercise its best judgment to determine that rule which would be applied by the state courts had they confronted the problem. It is the considered judgment of this Court that the Nevada state courts would give deference to the decisions of the California Supreme Court as interpreted in Thorne v. United States, supra, 479 F.2d 804. Therefore, the Court holds that the Nevada law is essentially the same as the Florida law before the Court in Emelwon, Inc. v. United States, supra, 391 F.2d 9, and the California law before the Court in *Thorne*, supra, i. e., the Florida type nonvicarious nondelegable duty exists in Nevada when a contractor is employed to perform a dangerous task. It is not necessary to decide whether or not the "general rule" type of vicarious nondelegable duty, as stated in

§ 416 of the Restatement of Torts 2d, also exists and this Court declines to do so.

The defendant has argued that the drilling of anchor holes is not a dangerous task which would create a nondelegable duty of due care in the AEC. But it is not the mere drilling which created the danger—it is the use of the drilling equipment in the vicinity of dangerous transmission lines. An ordinary task can become extra-hazardous when the work is to be performed around electrical transmission wires. Numerous cases involving painters treat the work as extra-hazardous, not because painting alone is dangerous, but, rather, because painting in close proximity to electrical lines is very dangerous. The duty arises because the work to be performed becomes extra-hazardous when it can be reasonably anticipated that the work will be near the electrical wires. Stancil v. United States, supra, 196 F. Supp. 478.

Before the nondelegable duty arising because of the use of a contractor to perform a dangerous task can exist, the employer himself must have knowledge of the existence of a risk to others and a showing of such knowledge must be made, regardless of what the independent contractor may have known. Courtell v. McEachen, 51 Cal.2d 448, 334 P.2d 870 (1950); Thorne v. United States, supra, 479 F.2d 804. Therefore, the AEC must have had knowledge of the dangerous nature of the work to be performed by REECo and this requires that the AEC must have had knowledge of the proximity of the drilling operations to the transmission lines. As previously stated in the discussion of the AEC's duty arising from its ownership of the electrical distribution system, the evidence proved that the AEC had approved the extensive work for that area and therefore the Government had knowledge that extensive drilling was planned in the locality of the extra-hazardous transmission lines, and the Government had knowledge which would allow the reasonable anticipation that the work would be extra-hazardous. As also previously stated, even if the approval of the work in that area did not give the AEC knowledge of the potentially dangerous situation, the lack of such knowledge would have been a breach of the AEC's duty which arose from its ownership of the dangerous instrumentality. Therefore, the Court holds that the AEC had knowledge of the potentially dangerous work to be performed by the contractor, either because the Government acquired knowledge by the approval of the work in the area of the transmission lines or because the Government is charged with having the knowledge because of its duty as the owner of the electrical distribution system to know when work is to be performed in the danger zone.

The AEC, as the employer of an independent contractor to engage in a dangerous activity, had a nondelegable duty to see to it that the independent contractor carried out his task in a nonnegligent manner. The AEC's breach of this duty is manifest. The previous discussion of the numerous safety precautions which could have prevented the accident, but which were not implemented, exemplifies the AEC's failure to make sure that REECo carried out its task in a safe manner. Under Nevada law, the AEC, in this case, was under a duty to exercise reasonable care to see that proper precautions were taken by the contractor. The precautions were not taken and the AEC did not monitor REECo to make certain that they were taken. The AEC had a nondelegable duty to exercise reasonable care, including the duty to see to it that the contractor exercised such care. Thorne v. United States, supra. The AEC breached this duty.

There can be no question but that the AEC's duty breach was the proximate cause of the death of Thomas McGarry. Although REECo may have been negligent in failing to discharge numerous duties, the AEC also breached its own duty and also proximately caused the accident.

In the previous discussion of the AEC's duty to exercise a high degree of care commensurate with the risk which arises from the ownership of the electrical distribution system at the Test Site, the Court reserved for later discussion the issue of whether such duty was nondelegable. The plaintiffs argue that the duty arising from the ownership of the dangerous instrumentality is a nondelegable duty. The Court held previously that even if the duty is not a nondelegable one, the AEC had not fulfilled the high standard of care which the dangerous risk required. The contractual delegation, without any further monitoring or supervision by the AEC, was simply not reasonable care commensurate with the risk involved. There is authority for the plaintiffs' proposition that the duty is nondelegable. 26 Am.Jur.2d at 260. The Court holds that the law in Nevada pertaining to the duty arising from the ownership of the inherently dangerous electrical distribution system is the same as the Florida type nonvicarious nondelegable duty explained in Emelwon, Inc. v. United States, supra, and further explained in Pierce v. United States, supra, 142 F.Supp. 721. Therefore, the AEC had the duty to use a standard of care commensurate with the risk involved in the ownership of the dangerous instrumentality, and such duty could not be delegated to REECo. The AEC, by failing to make certain that adequate safety measures and procedures were a part of the electrical distribution system, breached this nondelegable duty of due care. The AEC had the nondelegable duty to see that adequate safety procedures were maintained for any persons who could foreseeably come in contact with the transmission wires; this duty was breached and there is no doubt that this duty breach was also a proximate cause of the death of Thomas McGarry.

## Assumption of Risk and Contributory Negligence

Although the concepts of assumption of risk and contributory negligence are often, as in the case presented here, factually and logically interrelated, the law of Nevada maintains a distinction between these defenses. See Downing v. Marlia, 82 Nev. 294, 417 P.2d 150 (1966). They will thus be discussed separately below.

### 1. Assumption of Risk

Defendant's fourth affirmative defense avers that defendant apprised the deceased "of the conditions of the premises" and that the presence of the electrical line was "in and of itself, sufficient notice of the nature and extent of such line". Pursuant to this allegation, the pretrial order incorporated the question of deceased's assumption of risk, if any, as an issue for trial.

The testimony of Mr. Dasher, the only witness to the accident, shows that Mr. McGarry and Mr. Dasher were at no time advised of the transmission wires at the work site and that Mr. McGarry probably was never aware of the overhead lines. Mr. Dasher testified that he (Dasher) did not himself notice the wires until after the electrocution of decedent. It is axiomatic that assumption of risk is a matter of knowledge of the danger and intelligent consent to it. See Sierra Pacific Power Co. v. Anderson, 77 Nev. 68, 358 P.2d 892, 894 (1961); Papagni v. Purdue, 74 Nev. 32, 35, 321 P.2d 252, 253 (1958); Prosser on Torts, 3rd ed., § 67 (1964) p. 452. If the deceased was unaware of the presence of the electrical wires, he could not have fully appreciated any danger caused thereby and voluntarily assumed such risk. Ordinarily, "the plaintiff will not be taken to assume any risk of either activities or conditions of which he is ignorant." Prosser, supra, at 462; Calanchini v. Bliss, 88 F.2d 82 (9th Cir. 1937); Sierra Pacific Power Co., supra, 358 P.2d at 894; Berrum v. Powalisz, 73 Nev. 291, 317 P.2d 1090 (1957).

Further, accepting arguendo that the lines were so obvious that the deceased may be held to have known of their presence, this Court finds that he cannot be charged with knowledge of, and ap-

preciation of, the risk that the wires would be energized and that defendant would negligently fail to assure that the power had been cut off or the lines made safe in some other manner.

First, decedent had a right to reasonably assume the power lines were not "live" when allowed by defendant to work in close proximity to them. Before one can be said to have assumed the risk of working in the vicinity of "hot" electrical lines:

"The . . . condition and risk must have been sufficiently obvious and the employee's relation thereto sufficiently close to enable him to have been aware of them."

Pierce v. United States, supra, 142 F. Supp. 721, 727. In *Pierce*, an FTCA case arising from an electrical accident causing injuries to a lineman at a Government ordnance works, the Court indicated that the existence of electrical power is, of course, not patent. Because of an electrical lineman's "sufficiently close" relation to risks of live wires, the Court apparently felt constrained to discuss in detail why such risks were not assumed in the case before it. There the plaintiff's foreman had indicated the power was off and plaintiff additionally used his equipment to test for the presence of electricity. As an employee's relationship to electrical work is more removed, however, so too are the conditions precedent to assumption of the risks of "live" wires: awareness of a "hot" condition and voluntary encountering of the hazards caused thereby. In Stancil v. United States, supra, 196 F. Supp. 478, the Court, in discussing the defendant's assertion that decedent there, a painter accidentally electrocuted by visible power lines running to the pier he was painting, was contributorily negligent, appropriately indicated the absence of such conditions precedent in cases involving many nonelectrical workers. The Court stated, simply, at p. 481:

"Assuming arguendo that Stancil was a painter of some experience accustomed to working around electric

wires, he had the right to expect that the current had been disrupted when he was ordered, without warning, to paint in the vicinity of wires . . . ."

These considerations attend the instant case. The evidence shows that on the day of the accident decedent had not been warned that there were electrical wires at the work site, and thus there was no warning that the wires would be live. The evidence adduced indicates that test hole preparations were not permitted in locations near transmission lines. Assuming the risk of slowly moving a portadrill rig under an overhead wire obstruction is one thing; assuming the risk that the wire is "hot" or not otherwise suitably made safe (for example, by "hot line tagging" the circuit breaking mechanism) is quite another. Given defendant's practice regarding electrical safety precautions as to work locations prior to the accident, it was not unreasonable for the deceased, had he been aware of the lines, to assume the former and not the latter risks. Decedent's employ was not so closely related to activities with power lines that he can be constructively held to a knowledge that the wires in a work-assignment area would be "live". Where an employee is reasonably led to believe that no danger from the line is to be expected and a "live" condition cannot readily be ascertained by the employee, no circumstances are presented which support a finding of assumption of risk, either actual or constructive. Pierce v. United States, supra, 142 F. Supp. 721 at pp. 727–728.

Second, in view of considerations closely associated with those immediately above, coupled with the principle approved in Nevada (Los Angeles & S. L. R. Co. v. Umbaugh, 61 Nev. 214, 123 P. 2d 224, 234 (1942), quoting Newson v. New York Central R. R. Co., 29 N.Y. 383, 390) that:

" 'The law will never hold it imprudent in any one, to act upon the presumption that another, in his conduct,

will act in accordance with the rights and duties of both.' " this Court finds that the decedent did not assume the risks arising from the defendant's negligent failure to take suitable electrical safety precautions. Even if aware of the wires, the decedent had a right to assume the wires had been made safe. The record is devoid of any indication that he had been warned of unsafe wiring or was presented with circumstances sufficient to warn him of defendant's negligent failure to render conditions otherwise than safe on the day of the accident. Thus, under the principle noted in *Umbaugh*, he prudently could assume defendant had not been negligent in fulfilling its duty towards him. The plaintiff does not assume the risk of any negligence which he has no reason to anticipate. See Prosser, supra, at page 462.

In sum, the deceased, Thomas McGarry, did not assume the risk of electrocution in fulfilling his employment obligations on December 10, 1969.

### 2. Contributory Negligence

Defendant placed its main emphasis on this affirmative defense, giving little, if no, stress at trial to its defense of assumption of risk. In analyzing the degree of due care deceased was obligated to exercise for his own safety, however, much of the above discussion of assumption of risk becomes applicable.

In essence, defendant contends that deceased was contributorily negligent in (1) failing to see the power line, (2) driving with the portadrill rig erected in derogation of a drilling equipment safety regulation, and (3) failing to exercise the responsibility for safety imposed by the employer on decedent, the ranking REECo employee at the instant work site. The third contention is merely a broad claim that deceased was negligent, and is dependent upon the other two contentions which summarize those specific actions defendant argues constitute decedent's contributory negligence. Thus, the third contention has substance and relevance here only if the first and second contentions meritoriously establish contributory negligence on the part of the decedent. They do not.

While in the exercise of reasonable care a person having normal faculties of sight is presumed to have seen that which was in the sight and range of vision, Los Angeles & S. L. R. Co. v. Umbaugh, supra, 123 P.2d 224 at p. 234, and failure to see a clearly visible hazard may well constitute negligence, see Gunlock v. New Frontier Hotel Corp., 78 Nev. 182, 370 P.2d 682 (1962), such failure to observe a hazard will bar recovery as contributory negligence only if the death resulted from the particular risk to which deceased's conduct exposed him. See Prosser, supra, at p. 286; Restatement of Torts, § 468; Hawthorne v. Gunn, 123 Cal.App. 452, 11 P.2d 411 (1932). Similarly, driving with the portadrill rig extended, assuming for this discussion that such action constitutes a failure to exercise reasonable care, will not bar recovery if the death did not result from the risks such conduct created. Under the set of circumstances presented by this case, the risk of electrocution was not a foreseeable result of, nor created by, decedent's actions. Recovery by his survivors is not, therefore, precluded.

As discussed at length in considering assumption of risk, even presuming decedent knew the wires were present, he could reasonably have assumed they were not "live" or that they had otherwise been made safe and could prudently have relied on an absence of defendant's negligence in that regard. As stated by the Court in *Stancil*, applying the facts there presented:

> ". . . he had the right to expect that the current had been disrupted when he was ordered, without warning, to paint in the vicinity of wires . . . Certainly an employee would not be required to anticipate that a competent superintendent would order him to paint in a known hazardous place without at least a warning."

Stancil v. United States, supra, 196 F. Supp. at 481 (the Court finding that "Clearly the defense of contributory negligence is untenable.") Even had decedent been fully aware of the overhead lines, then, the risks he foreseeably created in driving slowly beneath them with the rig extended, while including snagging the rig or causing the rig or wire to break or causing portions of the rig to topple, did not include electrocution as a consequential danger. This result is unchanged even if he was unaware of the wires, as Mr. Dasher's testimony intimates, when he drove under the lines. The fact remains that had defendant fulfilled its duty to deceased, as he justifiably could have assumed defendant would do, the deceased would have been unharmed even though he failed to see the lines and violated a safety regulation against moving a portadrill with the rig extended.

The concept is not new in Nevada that recovery is not barred for contributory negligence where the person injured relied, in assessing and encountering risks, upon the defendant fulfilling a duty of due care and the injuries resulted from a justifiable discounting of certain risks on the basis of that reliance. In Los Angeles & S. L. R. Co. v. Umbaugh, supra, 61 Nev. 214, 123 P.2d 224 (1942), a case involving a truck passenger killed in a collision at a train crossing, the Nevada Supreme Court accepted this concept. In that case, the Court reaffirmed the notion that a person of normal sight is presumed to have seen that which was within the range of vision, there a train. The Court went on to state, concerning defendant train company's defense of contributory negligence:

". . . When the truck came near the crossing it would have been in no zone of danger and could have passed over with a margin of safety if the train had been traveling at a proper rate of speed . . . If (the train had not been speeding) plaintiff's decedent would have been unharmed. Under these circumstances, with the

burden of proof on (defendant) to make out the defense of contributory negligence, we are unwilling to say that it was established as a matter of law. 'The law will never hold it imprudent in any one, to act upon the presumption that another, in his conduct, will act in accordance with the rights and duties of both.' "

123 P.2d at 234. The plaintiff is not to be barred from recovery where the asserted failures of deceased to exercise reasonable care for his own safety do not create the particular risk out of which his death resulted. That principle controls the issue of contributory negligence in the instant case.

### Damages

The amount of damages to be awarded is limited by the pretrial order (February 2, 1973) which states, at page 3:

"11. That the basic standard for determining damages in this case, as set forth under the Federal Tort Claims Act (28 United States Code, Section 1346(b)), is that an award must be limited to compensatory damages, 28 United States Code, Section 2674.

"12. That subject to the above limitation, the nature and measure of damage is governed by the law of the state where the cause of action arose (28 United States Code, Section 1346(b)), here the law of the State of Nevada.

"13. That the judgment liability in this case may not exceed the amount claimed administratively by the respective plaintiffs, namely, $100,000 in the case of Patricia McGarry Schell and a combined total of $250,000 in the case of Harriet McGarry and Dennis McGarry, in accordance with the 28 United States Code, Section 2675(b)."

Harriet McGarry testified that Thomas McGarry was a devoted husband and father. The McGarrys had been married for almost 26 years and the testimony showed that he was a dutiful hus-

band and the loss of his companionship, society and affection was a real one.

Dennis McGarry was 15 years of age at the time of his father's death. He testified to their close relationship and the reliance that he placed on his father for guidance and companionship.

Patricia McGarry Schell had left home and had been married several years prior to Mr. McGarry's death. She became a registered nurse as a result of her father's willingness to provide her with an education. She and her husband received no monetary contribution from her father after the time she left college.

The McGarry family, as a result of the accident, was reduced from a family whose bread winner earned $14,620.00 per year to a household that at the time of trial, according to Harriet McGarry's testimony, was totally dependent upon the sums provided by the Nevada Industrial Commission and the Veterans Administration.

The plaintiffs' economist, Dr. Robert E. Miller, testified that the economic loss alone under acceptable statistics and economics was $268,420. (Plaintiffs' Exhibit 1, page 6.)

The plaintiffs seek an award of the total administrative demand, i. e., $350,-000 for both parties.

See the Appraisal of Lost Economic Value of Thomas McGarry by Dr. Robert E. Miller, Plaintiffs' Exhibit 1.

An issue presented by the pretrial order is whether plaintiffs are entitled to recover, under 28 U.S.C. §§ 1346(b) and 2674, for the loss of society, affection, comfort and companionship which they suffered as a result of Thomas McGarry's death.

■ The Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1964), refers to "the law of the place where the act or omission occurred". Under this provision, the applicable state law governs in assessing wrongful death damages. See, e. g., United States v. Furumizo, 381 F. 2d 965 (9th Cir. 1967) (Hawaii law applied in computing damages for wrong-ful death action under FTCA); United States v. Miller, 331 F.2d 414 (9th Cir. 1964) (Arizona law applied, included "loss of affection and related items"); Binney v. United States, 329 F.Supp. 351 (D.C.Or.1971) (Oregon law applied); Santa v. United States, 252 F.Supp. 615 (D.C.Puerto Rico 1966) (Puerto Rico law applied, included recovery for loss of companionship, society and consortium); but see Hoyt v. United States, 286 F.2d 356 (5th Cir. 1961) (where state law provides *only* for punitive damages in case of wrongful death, damages not recoverable against the United States, and the FTCA, as amended in 1947, allows for recovery of damages measured by "pecuniary injuries", congressional intent in such circumstances is that pecuniary injuries do not include grief, loss of society or companionship). Hence, the recovery in this case is to be determined by Nevada law. 28 U.S.C. §§ 1346(b), 2674; Nevada Revised Statutes, 1967, § 41.090; see United States v. Sommers, 351 F.2d 354 (10th Cir. 1965) (where plane collision and death occurred in Nevada, Nevada law applied in determining damages).

Nevada Revised Statutes § 41.090 provides that:

"The court . . . may give such damages, pecuniary and exemplary, as shall be deemed fair and just . . . including damages for loss of probable future companionship, society and comfort."

Nevada explicitly recognizes, then, that:

". . . even pecuniary loss may extend beyond mere contributions of food, shelter, money or property; . . . that the society, care and attention of the deceased are 'services' to the survivor with a financial value, which may be compensated."

Prosser on Torts, 3rd ed., § 121 (1964) p. 930. The provision for lost companionship, society and comfort was added by amendment in 1960 (NRS A 1960, 321), upheld by the Nevada Supreme Court in 1963 (Porter v. Funkhouser, 79 Nev. 273, 382 P.2d 216), and applies to

the instant case (see United States v. Sommers, supra, 351 F.2d at pp. 359–360, the Court intimating that had the amendment been in force in 1958, the date of the deaths in that case, it would have been proper to include these elements of damages).

To Harriet McGarry for the lost pecuniary value of the life of Thomas McGarry and for the loss of companionship, society and comfort, the Court awards the sum of $185,000.00.

To Dennis McGarry for the lost pecuniary value of the life of Thomas McGarry and for the loss of companionship, society and comfort, the Court awards the sum of $65,000.00.

To Patricia McGarry Schell for the loss of companionship, society and comfort, the Court awards the sum of $50,000.00.

The foregoing opinion constitutes this Court's findings of fact and conclusions of law. Let judgment be entered accordingly.